**UNION BANK, Executor, and Anna Goldenberg**

v.

**UNITED STATES.**

**Jerome GOLDENBERG and Helena Goldenberg**

v.

**UNITED STATES.**

**Ida GOLDENBERG**

v.

**UNITED STATES.**

Nos. 52–59, 53–59, 54–59.

United States Court of Claims.

Jan. 18, 1961.

George T. Altman, Beverly Hills, Cal., for plaintiffs.

Eugene Emerson, Washington, D. C., with whom was Charles K. Rice, Asst. Atty. Gen., James P. Garland and Philip R. Miller, Washington, D. C., on the brief, for defendant.

MADDEN, Judge.

The plaintiffs, in their tax year 1954, received certain profits. They were required to pay income taxes upon these profits on the basis that they were ordinary income. They contend that the profits were capital gains, and taxable only as such.

Ida Goldenberg, a widow, and her son Sol developed a prosperous business in Los Angeles, California. They manufactured and sold tread rubber for the retreading of tires, and materials for the repair of tires. They also distributed new tires, under a franchise from the B. F. Goodrich Company. Their market area was southern and central California. Beginning in 1944 the business was carried on as a partnership. In 1946 it was transferred to a corporation in which the two former partners were the only stock-

holders. In 1948 another partnership was formed by Sol, Ida and Jerome Goldenberg, Jerome being another son of Ida. The partnership made an agreement with the corporation which had been formed in 1946, that the partnership would purchase and market the products manufactured by the corporation.

Some time prior to November 1, 1951, a representative of Loyola University Foundation entered into negotiations with the Goldenbergs to buy the assets of the corporation and the partnership. The Foundation was a California corporation which, in 1946, had been determined to be exempt from Federal income taxes as an educational and charitable organization. In 1952 its name was changed to University Hill Foundation.

Representatives of the Foundation made a thorough examination of the plant, books, balance sheets and operating statements of the Goldenberg properties. They first offered $1,600,000, then $1,-800,000 and finally $2,000,000, plus the book value of the assets. There was negotiation over the amount of the down payment, and the period of years within which the purchase price should be paid. The Goldenbergs prevailed as to the down payment, which was fixed at $100,000 and the Foundation prevailed as to the time of payment, which was set at 10 years. The Foundation requested Sol Goldenberg to manage the business for five years. He agreed to do so for three years.

The transaction was consummated as of November 1, 1951, by the transfer by the Goldenbergs to the Foundation of all of the stock of the corporation and all of the assets of the partnership, for $2,000,-000, plus the book value of assets of the corporation and the partnership, plus $50,000 for the real estate on which the business was conducted. The Foundation paid $100,000 down and assumed and agreed to pay all the existing obligations and liabilities of the corporation and the partnership as reflected by a certified audit by the Goldenbergs' accountants. The Foundation agreed to pay the balance of the purchase price by paying to the Goldenbergs 90 percent of all rents which it would receive from a lessee to which the Foundation would lease the business for operation, except that the Foundation could retain the first $95,000 of such rents.

The 90 percent of the rents were to be paid to the Goldenbergs until the full purchase price was paid. The Foundation was not obligated to pay the purchase price except out of the rents, and there was to be no interest for ten years, but if the full purchase price had not been paid at the end of ten years, the balance was to be then due and payable, and was to bear 4 percent interest from that time. Upon default of the Foundation's obligation, the Goldenbergs could at their option, declare the entire purchase price due and payable, whereupon the trade name of the business would revert to the sellers. The Foundation gave to the Goldenbergs a mortgage upon the real estate and a chattel mortgage upon the personalty.

The lessee operating company to which the Foundation leased the facilities of the business was a corporation, formed for the purpose, of which corporation Sol Goldenberg was president. Its lease from the Foundation was for five years. It was to pay the Foundation as rent 80 percent of the net profits of the operation of the business. During the period of the lease, a majority of the stock of the lessee corporation was to be in the hands of persons approved by the Foundation. There were, of course, many other provisions for the details of a sizable and complicated business transaction. They are recited in our findings.

The Government claims that what was labeled as a sale was so labeled only for the purpose of making the proceeds of the transaction appear to be capital gains, thus making them eligible for the reduced income tax rate on such gains. It says that the transaction was in fact a continuation by the Goldenbergs of the operation of their business, and that their receipts were ordinary income, taxable as such.

There has been much evidence and argument about whether the business was worth the price which the Foundation agreed to pay for it. The Foundation had acquired a large number of going enterprises. It had been dealing in a rising market. Its earnings had been tax exempt, under a 1946 determination by the tax authorities. If it could acquire a profitable and growing business with a relatively small down payment and initial liability for the current obligations of the business, and commit itself only to devote the earnings of the business to the payment of the purchase price, it could afford to agree to a higher price than would be prudent for a normal purchaser which obligated itself at all events to pay the agreed price. From the Foundation's standpoint, the transaction was highly speculative because of the price it agreed to pay, but it had so little of its own money at stake that its losses would be tolerable if the speculation proved unsuccessful. In fact it turned out to be highly successful. In spite of the fact that the Foundation's tax exemption was revoked at about the same time that it made this purchase, it will in 1961, at the end of the ten years in which it had to pay for the property, be the owner of a large and profitable business, paid for out of the profits of the business. Whether it has also paid its taxes out of those profits, or out of other funds, we do not know.

■ The fact that a purchaser of an asset pays more for it than it is worth does not, of itself, convert the sale into something other than a sale, for tax purposes. It may, at the most, suggest to a diligent tax collector that the transaction may have other features which belie its appearance. When, however, the tax collector has searched for those other features and has not found them, he must be content with collecting his capital gains tax.

From the standpoint of the Goldenbergs, they were, before the 1951 transaction, the owners of valuable properties and a valuable going business. The Government takes no exception to the trial commissioner's finding that the fair value of these assets to the normal taxpaying investor would have been $1,174,006.-23. After the 1951 transaction the Goldenbergs had no interest in these assets except a security interest, the power to take them back in case of default in payment for them. If they increased in value because of general prosperity or business success, or in dollar value because of inflation, the Goldenbergs would get no part of that important incident of ownership. If the Foundation had defaulted and the Goldenbergs had got their property back, and had again operated it and made profits from it, they would of course have had to pay ordinary income tax on those profits. They did not and will not get the property back, and when the final payment is made by the Foundation in 1961, even their security interest in the property will be gone, and they will have no relation whatever to it.

We think it is logically and legally impossible for an owner to part with his property, for a consideration, without selling it. The consideration which he gets for parting with his property is not income from the property, but is the price of his parting with the property.

■ The plaintiffs are entitled to recover on their claims relating to the transaction with the Foundation.

Sol Goldenberg, one of the plaintiffs in No. 52–59, participated as a partner in some real estate transactions unrelated to the Foundation transaction. These transactions are described in findings 64 through 72. Sol Goldenberg received in 1954 certain profits from these transactions. He treated these profits as capital gains, for income tax purposes. The tax authorities treated them as ordinary income derived from the business of selling real estate, and required him to pay income taxes on that basis. We do not analyze these transactions in detail but state our conclusion that we are not persuaded that the determination of the taxing author-

ities was erroneous. The plaintiffs in No. 52–59 are not entitled to recover on this part of their claim.

The plaintiffs in each of the three cases are entitled to recover, with interest as provided by law, on their claims relating to the proceeds of the transaction with the Foundation and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

JONES, Chief Judge, and DURFEE, LARAMORE, and WHITAKER, Judges, concur.