**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**Clay B. BROWN and Dorothy E. Brown, Donald L. Brown and Ingrid R. Brown, Charles William Booth and Nancy H. Booth, Donald Lee Brown, Philip F. Brown, Marilyn Brown, Respondents.**

Nos. 18228–18233.

United States Court of Appeals Ninth Circuit.

Dec. 10, 1963.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, and Gilbert E. Andrews, Attorneys, Department of Justice, Washington, D. C., for petitioner.

Mautz, Souther, Spaulding, Kinsey & Williamson, and William H. Kinsey, Portland, Or., for respondents.

Arthur A. Armstrong, Los Angeles, Cal., amicus curiæ.

Before HAMLIN and DUNIWAY, Circuit Judges, and KUNZEL, District Judge.

DUNIWAY, Circuit Judge.

The Commissioner of Internal Revenue asks us to reverse decisions of the Tax Court. We are of the opinion that the decisions must be affirmed.

Involved is a transaction of the type described by Moore and Dohan in an article entitled: "Sales, Churches and Monkeyshines," 11 Tax.L.Rev. 87 (1956), and by Lanning in an article entitled: "Tax Erosion and the 'Bootstrap sale' of a Business," 108 U. of Pa.L.Rev. 623 (1960). The transaction is described in great detail in the findings of the Tax Court, which are reported at 37 T.C. 461. In his opening brief the Commissioner states: "No exception is taken to the detailed basic findings of the Tax Court."

In the same brief the Commissioner summarizes what he contends are the essentials of the transaction. We quote the summary, but with additions, in brackets, from the record:

"Taxpayers, consisting of Clay Brown, his wife and three children, and the two Booths, owned substantially all of the stock of Clay Brown & Company, which had lumber interests and saw mills near Fortuna, California. Although the total cost basis of their investment was only $42,000, the accumulated surplus of the corporation at January 31, 1953 was $448,472, and prospects of future earnings were good.

"In the summer of 1952, Clay Brown, the president of the corporation and spokesman for the other stockholders, was approached by a representative of the Institute, a tax-exempt corporation, who supplied him with brochures describing the tax advantages of a particular type of 'sale' transaction. [There was considerable bargaining, at arms length, and a price was agreed upon that was within a reasonable range in light of the earnings history of the corporation and the adjusted net worth of its assets.] When, as it happened, taxpayers agreed to the plan, a complex set of interrelated legal documents was drafted to give it effect. Pursuant to the overall plan agreed upon in advance, the following steps were taken:

"(a) Taxpayers endorsed and delivered all of their shares in the corporation to the Institute, together with $125,000 face amount of promissory notes of the corporation held by Clay Brown and his wife. On the same day, February 4, 1953, the Institute delivered to taxpayers its promissory note in the face amount of $1,300,000. The note, which was to mature approximately 10 years later, was nonnegotiable and noninterest bearing. The Institute assumed no liability for payment of the note from its own assets. Payment of the purchase price was to be made solely out of amounts received by the Institute as 'rental' income of the business assets, of which 90 percent would be turned over to taxpayer as periodic installments.

"(b) The Institute was left no option as to the disposition of the property, which was provided for in predrafted instruments. The following steps were taken pursuant to the plan: (1) The corporation was dissolved; (2) $5,000 of the current assets was turned over to taxpayers as a down payment; (3) the remaining net current assets were 'sold' for another promissory note to a new corporation, Fortuna Mills, Inc., organized by taxpayer Clay Brown's attorneys for the specific purpose of taking over the business of the dissolved corporation; [All of the issued stock of Fortuna was purchased by the attorneys, with their own funds, for $25,000.] (4) all of the other assets were mortgaged back to taxpayers, permitting reacquisition of [that portion of] the business assets in the event of default on the installments on the purchase price; (5) the same assets were 'rented' by the Institute to Fortuna for 80 percent of the net profits of the business, without allowance for taxes or depreciation. The Institute, retaining 10 percent of this amount, was obligated to turn over the balance to taxpayers to be applied toward the purchase price.

"(c) As part of the plan, taxpayer Clay Brown was employed as 'general manager' of Fortuna at an annual salary of $25,000, and it was provided that if he ceased to act as general manager, his successor would be selected by taxpayers. He exercised substantially the same powers as those which he had as president of the dissolved corporation, and no property could be sold

without his consent. Moreover, Brown personally guaranteed mortgage loans of the old company transferred to Fortuna, and he also personally guaranteed another $50,000 loan to Fortuna, which had been capitalized at only $25,000.

"The new Fortuna corporation took over the operation of the business, which continued for 4½ years on the same premises, with the same operating personnel and under practical control of taxpayers. On June 19, 1957, after suffering business reverses, Fortuna shut down the mill on word from Clay Brown. Taxpayers did not exercise their option to declare a default and formally reacquire their property by foreclosure. Instead, they arranged for the Institute to sell the assets, retaining 10 percent of the proceeds. The assets, which had been appraised prior to the original 'sale' to the Institute at more than $1,000,000 were sold at only $300,000, to outsiders at sometime in July, 1959. Taxpayer received 90 percent of the proceeds. Steps were taken at that time to settle out and cancel all of the tricornered arrangements between Fortuna, the Institute and taxpayers. The net financial result of the plan was that taxpayers received a total of $936,131.85."

We think we should add to this summary certain additional findings and conclusions of the Tax Court which are:

1. That there was a change of economic benefits in the transaction.

2. That the primary motivation of the Institute was the prospect of ending up with the assets free and clear after the purchase price had been fully paid, which would then permit the Institute to convert the property into money for use in cancer research.

In the court below the Commissioner took two alternative positions: One was that the transaction was a sham. This position is abandoned here. The other, which the Commissioner also takes before us, was that the Tax Court erred in holding that there was a sale within the meaning of section 117(a) of the Internal Revenue Code of 1939 and section 1222(3) of the Internal Revenue Code of 1954 because, so the Commissioner says, certain normal aspects of the sale of a business were missing. These are (1) shift of business risk; (2) shift of benefit of income; (3) shift of operational control; (4) permanent shift of ownership of assets and (5) release of sellers from business indebtedness. The Commissioner relies upon Burnet v. Harmel, 1932, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 as to shift of business risk, upon Helvering v. Clifford, 1940, 309 U.S. 331, 60 S.Ct. 554, 84 L. Ed. 788 as to shift of benefit of income, and on Commissioner v. Sunnen, 1948, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 as to shift of operational control.

We think that the Commissioner's contentions are well answered in the opinion of the Tax Court, and also in the following cases: Commissioner v. Johnson, 1 Cir., 1959, 267 F.2d 382; Union Bank v. United States, Ct.Cl., 1961, 285 F.2d 126.

Here, as in those cases, there was a transfer of title; there was a shift of business risk in the sense that the operation of the business was in the hands of a new company owned by third persons, albeit managed under a contract by one of the taxpayers; there was a shift of benefit of income in the sense that Fortuna retained 20% of it and the Institute retained 10% of 80%; there was no understanding that the assets were to come back to the taxpayers under any circumstances other than a default in the payment of the purchase price; there was a permanent shift of ownership of assets. The management contract and the guarantee of certain of Fortuna's borrowings by one of the taxpayers (Clay Brown), were designed to secure the payment of the price. There was no understanding that, if the business should be unsuccessful, Brown would take action to "trigger" a default, thus causing a reversion of the mort-

gaged assets to the taxpayers. As was said by the court in Commissioner v. Johnson, supra, "The mere fact that the security holders may in the future have to resume proprietorship of the enterprise does not nullify the fact that they had sold those proprietary interests." (267 F.2d at 385)

The Commissioner relies also on Kolkey v. Commissioner, 7 Cir., 1958, 254 F.2d 51. This case was distinguished in Commissioner v. Johnson, supra, on the ground that in Kolkey the facts were different and the Tax Court had found, in substance in that case, that there was no sale. The Tax Court made the same distinction here, and we think it was correct. We think that the real holding in Kolkey was that the transaction was a sham. Here, the finding is the other way and the evidence sustains it.

There is no question that this transaction took the form that it did because the Institute is a tax-exempt corporation and that the price to be paid was probably greater for that reason. These facts may have some relevance in connection with possible tax liabilities of the Institute, but they do not, as a matter of law, establish that, so far as the taxpayers were concerned, the sale of their stock was not a genuine sale, which is the only issue involved in this case.

We think that it is of some significance that the problem of misuse by tax-exempt organizations of their tax exemption in transactions similar to this was considered by the Congress, which adopted certain remedial legislation in the Revenue Act of 1950. The history of this legislation appears in H.R.Rep. No. 2319, 81st Cong. 2d Sess., 1950–2, Cum.Bull. 330, 408–11, and in S.Rep. No. 2375, 81st Cong. 2d Sess., 1950–2, Cum.Bull. 483, 502 ff. Certain aspects of the transaction now before us were undoubtedly "tailored" to fit the law as amended by Congress in 1950, particularly section 101 of the Internal Revenue Code of 1939 as amended, and sections 421, 422, and 423. These sections all relate to the income and tax exempt status of the purchasing Institute; none

of them purports to deny to the sellers the right to treat the sale, for tax purposes, as a sale, and therefore to treat moneys received as capital gains. Congress could have dealt with that aspect of such transactions but did not do so. If, as is indicated by the writers of the articles cited at the beginning of this opinion, the present situation, insofar as the tax position of the sellers is concerned, is undesirable from a tax standpoint, it is still possible for Congress to provide a remedy.

Affirmed.