LOUIS BERENSON AND SUE A. BERENSON, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3677–70, 6069–70, 6088–70, Filed December 18, 1972. 6116–70, 2920–71, 3870–71.

*Isidore Feldman,* for the petitioners.
*John J. O'Toole* and *Richard Baron,* for the respondent.

QUEALY, *Judge:* The respondent has determined deficiencies in the Federal income tax returns of the petitioners as follows:

| Docket No. | Petitioners | Year | Amount |
|---|---|---|---|
| 3677–70 | Louis and Sue A. Berenson | 1966 | $9,873.33 |
| | Louis and Sue A. Berenson | 1967 | 16,361.01 |
| 6069–70 | Sam and Sarah Cohen | 1966 | 21,790.28 |
| 6088–70 | Isidore and Pauline Cohen | 1966 | 8,156.33 |
| 6116–70 | David and Marilyn Cohen | 1966 | 32,340.00 |
| 2920–71 | Isidore and Pauline Cohen | 1967 | 7,886.25 |
| | Isidore and Pauline Cohen | 1968 | 9,066.69 |
| 3870–71 | Estate of Sarah Cohen (Isidore Feldman, executor) and Sam Cohen | {1967 {1968 | 21,785.00 24,448.00 |

The above-entitled proceedings were consolidated for purposes of trial and opinion. Concessions and agreements having been made by the parties, the sole issue for decision in this case is whether the transaction pursuant to which petitioners purported to sell the stock of Kitro Casuals Co. and Marilyn Togs, Inc., to the Temple Beth Ami constituted the sale or exchange of a capital asset within the meaning of section 1222(3).[2]

---

[1] Cases of the following petitioners are consolidated herewith: Sam Cohen and Sarah Cohen, docket No. 6069–70; Isidore Cohen and Pauline Cohen, docket No. 6088–70; David Cohen and Marilyn Cohen, docket No. 6116–70; Isidore Cohen and Pauline Cohen, docket No. 2920–71; Estate of Sarah Cohen, Deceased, Isidore Feldman, Executor, and Sam Cohen, docket No. 3870–71.

[2] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioners Louis Berenson and Sue A. Berenson are husband and wife who filed their joint Federal income tax returns for the calendar years 1966 and 1967 with the district director of internal revenue in Newark, N.J. At the time of the filing of the petition herein, they legally resided in Passaic, N.J.

Petitioners Sam and Sarah Cohen were husband and wife who filed their joint Federal income tax returns for the calendar years 1966, 1967, and 1968 with the district director of internal revenue in Brooklyn, New York. At the time of the filing of the petition herein, Sam Cohen legally resided in Laurelton, New York, and Isidore Feldman, the executor of the Estate of Sarah Cohen, deceased, had his office in New York, N.Y.

Petitioners Isidore Cohen and Pauline Cohen are husband and wife who filed their joint Federal income tax returns for the calendar years 1966, 1967, and 1968 with the district director of internal revenue in Brooklyn, New York. At the time of the filing of the petition herein, they legally resided in Brooklyn, New York.

Petitioners David and Marilyn Cohen are husband and wife who filed their joint Federal income tax returns for the calendar year 1966 with the district director of internal revenue in Brooklyn, New York. At the time of the filing of the petition herein, they legally resided in Kings Point, New York.

Sue A. Berenson, Pauline Cohen, Sarah Cohen, and Marilyn Cohen are petitioners solely by reason of having filed joint returns, and Isidore Feldman is a petitioner solely by virtue of being the executor of the Estate of Sarah Cohen, deceased. Consequently, hereinafter the term "petitioners" will refer collectively to Louis Berenson, Sam Cohen, Isidore Cohen, and David Cohen.

Kitro Casuals, Inc. (hereinafter referred to as Kitro), was a corporation incorporated in the State of New York on August 14, 1959. It engaged in the manufacturing of women's sportswear. Its main office was located in New York, N.Y. In 1961 through 1965, Kitro filed timely income tax returns for its taxable year, which ended July 31 in each of said years. A short period return was filed for its final operations for the period August 1 to December 31, 1965.

Marilyn Togs, Inc. (hereinafter referred to as Marilyn), was a corporation incorporated in the State of New York on February 28, 1955. It was a selling organization, and its main office was located in New York, N.Y. In 1961 through 1965, Marilyn filed timely income tax returns for its taxable year, which ended July 31 in each of said years. A short period return was filed for its final operations for the period August 1 to December 31, 1965.

For the taxable years ended July 31, 1961 to 1964, inclusive, the U.S. Corporation Income Tax Returns filed by Kitro and Marilyn disclosed the following:

| Year ended July 31— | Sales | Taxable income | Federal income tax |
|---|---|---|---|
| *Kitro* | | | |
| 1961 | $1,919,750.89 | $14,312.59 | $4,293.78 |
| 1962 | 3,522,405.02 | 19,624.91 | 5,887.47 |
| 1963 | 3,946,783.11 | 24,030.03 | 2,977.30 |
| 1964 | 4,614,570.36 | 30,898.73 | 6,592.47 |
| *Marilyn* | | | |
| 1961 | $1,040,367.27 | $18,389.60 | $5,516.88 |
| 1962 | [1] 233,436.24 | 24,230.53 | 7,269.16 |
| 1963 | [1] 265,780.77 | 15,413.80 | 4,624.14 |
| 1964 | [1] 323,333.18 | 7,024.77 | 2,025.48 |

[1] Commissions.

For the taxable year ended July 31, 1965, the U.S. Corporation Income Tax Returns filed by Kitro and Marilyn disclosed the following:

| | *Kitro* | *Marilyn* |
|---|---|---|
| Gross receipt or sales | $6,514,980.82 | $419,764.84 |
| Cost of sales | 5,338,731.85 | |
| Gross profit | 1,176,248.97 | 419,764.84 |
| Other income | 10,473.79 | |
| Total income | 1,186,722.76 | 419,764.84 |
| Total deductions | 864,470.90 | 371,959.11 |
| Taxable income | 322,251.86 | 47,805.73 |
| Total income tax | 149,446.37 | 16,637.94 |
| Net income after tax | 172,805.49 | 31,167.79 |

The balance sheets as of July 31, 1965, attached to said returns, disclosed the following:

| Assets | Kitro | Marilyn |
| --- | --- | --- |
| Cash | $275, 892. 02 | $62, 451. 78 |
| Accounts receivable (less reserve) | 791, 358. 50 | |
| Inventories | 848, 174. 25 | |
| Other current assets [3] | 48, 943. 49 | 39, 639. 14 |
| Fixed assets [4] (net of depreciation) | 88, 526. 79 | |
| Other assets | | 168, 104. 79 |
| Total assets | 2, 052, 895. 05 | 270, 195. 71 |

| Liabilities and capital | Kitro | Marilyn |
| --- | --- | --- |
| Accounts payable | $1, 353, 624. 36 | $3, 383. 77 |
| Notes payable | 125, 000. 00 | |
| Other current liabilities | 355, 994. 51 | 191, 268. 61 |
| Common stock | 22, 000. 00 | 19, 000. 00 |
| Surplus | 196, 276. 18 | 56, 543. 33 |
| Total liabilities and capital | 2, 052, 895. 05 | 270, 195. 71 |

As of December 31, 1965, the total shares of common stock outstanding of Kitro and Marilyn and the number of said shares owned by each of the respective petitioners were as follows:

| Stockholders | Shares | |
| --- | --- | --- |
| | Kitro | Marilyn |
| David Cohen | 17. 6 | 35. 2 |
| Louis Berenson | 7. 04 | 14. 08 |
| Samuel Cohen | 13. 2 | 26. 4 |
| Isidore Cohen | 6. 16 | 12. 32 |
| | 44. 00 | 88. 00 |

The petitioners-stockholders constituted the management of Kitro and Marilyn. Their respective duties, as described by them, were as follows:

| | |
| --- | --- |
| David Cohen | Chief executive or general manager |
| Louis Berenson | Sales manager |
| Samuel Cohen | Production manager |
| Isidore Cohen | Production and shipping coordinator |

[3] Loans to stockholders.
[4] The fixed assets of Kitro consisted of sewing machines and office furniture at a cost amount of about $130,000. No real property was owned.

Temple Beth Ami (hereinafter referred to as the temple) is and was, during each of the years at issue herein, a nonprofit corporation located in Philadelphia, Pa., a religious organization exempt from tax under sections 501(a) and 511(a)(2)(A).

During the period involved herein, and prior thereto, the firm of Isidore Feldman & Co., New York, certified public accountants, were the accountants for both Kitro and Marilyn. Harvey Feldman was the employee of that firm to whom these accounts were assigned. In September 1965, a meeting was arranged between Harvey Feldman and one Robert M. Bernstein (hereinafter referred to as Bernstein) through a mutual acquaintance to discuss the possible sale of the stock of Kitro and Marilyn to the temple in Philadelphia, Pa. In a series of meetings, Bernstein explained the mechanics of a proposed sale of the stock to the temple. Following these meetings, Harvey Feldman consulted with David Cohen, one of the petitioners herein. David Cohen became very interested because it "was at least twice what anybody else offered." David Cohen instructed Feldman to go back to Bernstein and try to get the best price that he could.

Feldman and Bernstein thereupon set about to negotiate an agreement whereby the petitioners would sell their stock to the temple. They agreed upon a projection of estimated earnings before tax. They then allocated 80 percent of the estimated earnings to the petitioners and 20 percent of the estimated earnings to the partnership. In this manner, they arrived at a price of $6 million payable with interest at the minimum statutory rate, over a period of 13 years, making a total of $7,840,000.

The fair market value of the stock of Kitro and Marilyn, as measured by the price at which it could be sold as between the hypothetical willing seller and willing buyer for cash or its equivalent, independently of the services of petitioners, was not substantially in excess of its book value. The stated price of $6 million was more than double the price that would be paid for the stock, on substantially the same terms, by a prospective purchaser who was not exempt from the income tax.

As of December 31, 1965, petitioners David Cohen, Samuel C. Cohen, Louis Berenson, and Isidore Cohen, therein referred to as the sellers, and the temple, therein referred to as the buyer, entered into a "Sales Agreement," pursuant to which the sellers agreed to sell and the buyer agreed to purchase the outstanding shares of stock of Kitro and Marilyn for a stated purchase price of $6 million,

payable in quarterly installments, with interest at 4 percent, in accordance with the following schedule:

| Year | Annual amount to be paid | Quarterly amount to be paid | Allocation between interest and principal |
|---|---|---|---|
| 1966 | $300,000 | $75,000 | Principal. |
| 1967 | 300,000 | 75,000 | Principal. |
| 1968 | 400,000 | 100,000 | Principal. |
| 1969 | 400,000 | 100,000 | Principal. |
| 1970 | 400,000 | 100,000 | Principal. |
| 1971 | 500,000 | 125,000 | Principal. |
| 1972 | 600,000 | 150,000 | Principal. |
| 1973 | 700,000 | 175,000 | Principal. |
| 1974 | 700,000 | 175,000 | Principal. |
| 1975 | 700,000 | 175,000 | Principal. |
| 1976 | 1,000,000 | 250,000 | Principal. |
| 1977 | 920,000 | 230,000 | Interest. |
| 1978 | 920,000 | 230,000 | Interest. |

As of December 31, 1965, the temple and Bernstein entered into an agreement for the formation of a limited partnership, under the Uniform Limited Partnership Act of the Commonwealth of Pennsylvania, for the purpose of conducting business under the name of Kitro. Pursuant to said agreement, all rights, obligations, and liabilities of the buyer under the aforesaid sales agreement were transferred to and assumed by the partnership. The partnership agreement further provided that Bernstein would be a general partner and that the temple would be a limited partner.

From January 3, 1966, through January 1, 1981, the partnership agreement provided that the general partner's share in the profits and losses of the partnership was 4½ percent and the limited partner's share in the profits and losses of the partnership was 95½ percent. From and after January 1, 1981, the partnership agreement provided that the general partner and the limited partner were to share equally in all profits and losses of the partnership. The partnership agreement further provided that as of that date the capital accounts of the partners as then constituted would be totaled and each partner would receive an interest equal to one-half of the total capital of the partnership.

As of January 3, 1966, Bernstein, on behalf of the partnership, entered into an agreement with David Cohen, pursuant to which the latter was constituted general manager to supervise all operations of the business and to confer with the partners on the problems, growth, and development of such partnership. Said employment agreement provided for an initial term of 5 years, ending December 31, 1970, and gave to the manager the right to renew said agreement for an additional term of 5 years. In his capacity as general manager, David Cohen thereupon entered into an agreement with Samuel C. Cohen,

Louis Berenson, and Isidore Cohen, to be employed by the partnership as assistant general managers.

Finally, as of January 3, 1966, the petitioners, as sellers, and the temple, as buyer, together with Bernstein, entered into a modification agreement. Said agreement provided, in part, as follows:

4. The parties agree that in the event Buyer or Bernstein shall be in default under any of the provisions of the Sales Agreement, Management and Consultant Agreement, Limited Partnership Agreement and/or this Modification Agreement, that Sellers' sole remedy shall be the right to have returned to them the Buyer's capital account in the business formerly conducted by the Corporations. The parties agree that the Buyer's capital account shall consist of such assets, subject to liabilities and withdrawals, of the business formerly conducted by the Corporations, as suc h may exist at the time of the default. The parties agree that only the aforesaid it ems shall be subject to any claim of the Sellers by virtue of any default hereunder by Buyer or Bernstein. The parties further agree that none of the assets of the Buyer or Bernstein, except the Buyer's capital account in the business formerly conducted by the Corporations as aforesaid, shall be subject to the obligation of Buyer and/or Bernstein to Sellers under the agreements. The parties agree that, upon default, Buyer and Bernstein shall execute such assignments as are necessary to transfer to Sellers the Buyer's capital account in the business formerly conducted by the partnership, and the parties shall further execute mutual releases and any other required or desirable documents to effectuate the intent and purpose of this agreement. The provisions of this paragraph shall apply to any employment agreement which David Cohen enters into with any of the other Sellers.

As of December 31, 1965, Kitro and Marilyn were liquidated and the assets transferred to the partnership. Thereafter, the business was conducted under the name of Kitro Casuals Co., the partnership. The petitioners managed that business, performing the same duties that they had performed when employed by Kitro and Marilyn, the only change being the consultation with Bernstein in financial matters.

During the years involved in these proceedings, the results of the operation of the business under the name of Kitro Casuals Co., the partnership, were as follows:

| Year ending Dec. 31— | Pretax earnings |
|---|---|
| 1966 | $751, 086. 27 |
| 1967 | 354, 402. 09 |
| 1968 | 535, 205. 79 |

The petitioners duly received the amounts due under the sales agreement except that the petitioners permitted certain amounts due to be withheld to be used in the business. The amounts received were reported by petitioners as a gain from the sale of their respective shares of Kitro and Marilyn, taxable as a long-term capital gain pursuant to sections 1221 and 1222. In each of the years 1968 and 1969, the sum of $75,000 of the amount due petitioners was withheld, making a total of $150,000 due and unpaid as of December 31, 1969.

The petitioners owned all of the stock of Kitro and Marilyn and were engaged in the business of designing, manufacturing, and selling ladies' sportswear. The petitioners managed this business, each having specific areas of responsibility under the direction of David Cohen. The petitioners constituted a closely knit management group. One petitioner described it as a "family business," referring to conditions both before and after the purported sale. From modest beginnings, the petitioners had developed the business to the extent that its products were well received by the large chain buyers.

During the year 1965, the petitioners foresaw a substantial growth in sales and earnings. At the same time, David Cohen was looking into the possible sale of the business. He had discussions with various interested parties without success. At this time, their accountant, Harvey Feldman, was introduced to Bernstein, who had negotiated for the acquisition of other businesses for the Temple Beth Ami of Philadelphia, which sought to take advantage of the recent decision of the Supreme Court in *Commissioner* v. *Brown*, 380 U.S. 563 (1965). From that point on, the negotiations were entrusted to Feldman.

As a result of these negotiations, a plan was evolved pursuant to which the petitioners might ultimately receive $6 million plus interest from the purported sale of the stock of Kitro and Marilyn to the temple. Under this plan, the assets of the business would be transferred to a partnership in which the temple would constitute a limited partner entitled to 95½ percent of the profits. Projecting the earnings into the future, a schedule of payments was set up, pursuant to which specified amounts would be paid to the petitioners out of profits until such time as the sum of $6 million was paid in full, followed by the payment of interest at 4 percent, making a total of $7,840,000, to be paid to the petitioners by December 31, 1978.

During the period of the payout, the agreement provided that petitioners would continue to operate the business as salaried employees of the partnership. Neither the temple nor Bernstein paid anything for their interest in the business and neither stood to gain anything until such time as the petitioners were paid in full. At this time, what remained would be divided equally between the temple and Bernstein, notwithstanding that up until then the temple purported to have a 95½-percent interest in the earnings.

Except for amounts withheld for purposes of expanding the business during the years involved in this proceeding, the scheduled payments were made to petitioners as due. The petitioners elected to report the resulting gain from the transactions with the temple as a capital gain from the sale or exchange of a capital asset within the meaning of

section 1222(3). In his notice of deficiency, the respondent treated the gain as ordinary income on the grounds that the transaction did not constitute such a sale.

The petitioners' position in this case rests primarily on the decision of the Supreme Court in *Commissioner* v. *Brown, supra.*[5] In that case, the taxpayer owned substantially all of the stock of a lumber company. In 1953, an agreement was entered into to sell this stock to an exempt organization for $1.3 million, payable $5,000 down from the assets of the company and the balance without interest out of earnings over a period of 10 years. Pursuant to the agreement of sale, the assets of the business were taken over by an exempt organization and leased to a new corporation which would operate the business. As rental, the operating corporation was required to pay 80 percent of its operating profit without allowance for depreciation or taxes, 90 percent of which would in turn be paid to the former stockholders to apply on the $1.3 million note. Provision was made that if payments on the note failed to total $250,000 in any two consecutive years the seller could declare the entire balance due and payable. Clay B. Brown, principal stockholder and manager of the business, entered into a management contract with the operating corporation with the right to name his successor. Later, due to a decline in the lumber market, operations proved to be unprofitable. By agreement of the parties, the properties were sold for $300,000 with the exempt organization retaining 10 percent of the proceeds. In accordance with the terms of the contract, the exempt organization was relieved of any further liability. Total payments on the note from rentals and from the sale of the properties aggregated $936,131.85. The taxpayer treated the payments received from rentals as gain from the sale of capital assets. The Commissioner determined that the transaction did not constitute a completed sale, relying on the fact that since the exempt organization invested nothing, assumed no liability for the purchase price, and promised only to pay over a percentage of the earnings, the entire risk of the business remained with the sellers. A majority of the Supreme Court rejected that argument. In effect, the Supreme Court held that there is no less a sale even though the purchaser's obligation is limited to the earnings from the assets which were sold. Since the Supreme Court concluded that there had been a sale of the lumber business, it necessarily followed that the taxpayers were entitled to report amounts received from the sale as a capital gain.

As a result of *Commissioner* v. *Brown, supra,* the Congress enacted section 514.[6] The petitioners argue that the prior legislative history

---

[5] Our decision in *Royal Farms Dairy Co.,* 40 T.C. 172 (1963), also cited by petitioner, preceded the decision of the Supreme Court in *Commissioner* v. *Brown,* 380 U.S. 563 (1965), and presented facts which were indistinguishable from that case.

[6] Tax Reform Act of 1969, sec. 121(d);

of congressional action in this type of transaction, coupled with the enactment of section 514, constitutes an affirmation by the Congress of the petitioners' position in this case. The difficulty with that argument is that it assumes that there was in the first instance a sale of an income-producing asset, albeit debt-financed. That is the question to be decided in this case.

The decision of the Supreme Court in *Commissioner* v. *Brown, supra,* stressed the fact that the price to be paid for the assets, although payable solely out of earnings, was not disproportionate to the fair market value of the property sold. As a result, the respondent promulgated Rev. Rul. 66–153, 1966–1 C.B. 187, which held that the decision in *Brown* would not be deemed controlling where the consideration for the property sold was in excess of its fair market value. In conformity with this ruling, the position of the respondent in the notice of deficiency, and the evidence of the petitioners before this Court, were directed largely to the question of value.

In looking to the question of value, we are faced at the outset with the necessity of determining what was meant by the majority of the Supreme Court in *Commissioner* v. *Brown, supra,* in placing emphasis on the value of the property sold. If we consider what a private investor or commercial corporation would have paid for the business of Kitro and Marilyn, we must inevitably come to the conclusion that the stated price of the transaction between the petitioners and the temple was grossly excessive. Petitioners' counsel freely admitted as much.

On the other hand, as petitioners' counsel also stated, the formula whereby 80 percent of future earnings was paid back to the owners of the business and 20 percent of the future earnings was withheld by the exempt organization was one upon which businesses were being "bought and sold" between private owners and exempt organizations at the time in question. We would assume that the Supreme Court in *Commissioner* v. *Brown, supra,* was not referring to this type of transaction as a criteria for fair market value, but rather the more appropriate test is whether the agreed-upon price is disproportionate to the fair market value of the asset as the term "fair market value" is commonly understood.

While we would regard the question of value as evidentiary and certainly to be considered in determining whether there has been a sale, it is not controlling as a matter of law. Where the price is excessive, if measured by the norm of the conventional willing buyer and willing seller, such excess would only serve to indicate that there

was not in substance a bona fide sale of the property. Petitioners' counsel succinctly stated the issue, as follows:

Was there a bonafide [sic] sale based on the statutes in existence at the time? That is our position, your Honor, no getting away from that. We concede the Temple was selling us their tax exemption. We concede that we were buying it, that we wind up more selling to them than selling to an outsider, and we'll prove that with another witness.

The real question presented for decision in this case is whether, looking to the substance of the transaction, it can be said that the petitioners sold the dress business, or whether what really happened was that the petitioners agreed to pay to the temple any earnings in excess of the specified payments in exchange for the enjoyment of the exemption.

When we look to the record as a whole, it becomes apparent that there is no real dispute between the parties with respect to the fair market value of the property sold. As between a willing buyer and a willing seller, using the hypothetical yardstick of the marketplace, it is clear that the petitioners' stock was not worth $6 million. In fact, it is doubtful whether anyone would have paid as much as $3 million for the stock on an unconditional basis.

On the other hand, it must be assumed that from the standpoint of the tax-exempt purchaser, the opportunity to acquire either the business or its assets at the end of the payout period for the use of its exemption resulted from an "arm's-length" negotiation. The determination of the amount to be paid under this type of transaction was dependent, not on the fair market value of the property, but on projecting a schedule of earnings into the future which would be adequate to meet the payments as due and leave something "in the pot" for the exempt organization.[7]

At the outset, as distinguished from *Brown*, we are dealing with a business which was dependent largely on the managerial skill of the petitioners. We are not dealing with "bricks and mortar." The earnings of the business in the years prior to the sale were insignificant in relation to the sales price. Net worth was less than one-twelfth the sales price. All the petitioners really were selling was the expectation of future earnings. When viewed in this light, the question of fair market value, as conventionally determined, may become a significant factor. If the amount set forth as the purchase price is grossly disproportionate to present value of the business, there is a strong inference that the schedule of payments was intended, not as the purchase price, but as a means of returning the earnings to the former owners of the business at a tax saving.

---

[7] Petitioners' attorney stated that the temple's workpapers show it anticipated an ultimate profit of $1,250,000 for which it paid nothing.

In *Commissioner* v. *Brown, supra,* the discounted sales price payable over a period of 10 years was found not to exceed significantly the underlying value of the business. In the case before us, the amount payable was grossly disproportionate to the present worth of the business. It was predicated solely on an assumed-earnings base, the realization of which was not only subject to the risks of a highly competitive business, but was dependent on the continued managerial skills and services of the sellers. All the petitioners really had to sell was "themselves."

In *Commissioner* v. *Brown, supra,* upon payment of the note, the exempt organization would acquire ownership of the assets which were sold. In the case before us, once petitioners received payment in full, the temple was obligated to turn over approximately one-half of a supposed $6 million business to its 4½-percent partner, who had invested nothing.

With these facts in mind, can it be said that the temple really purchased the stock of petitioners? Or, if we look to the substance of the transaction, was the temple merely attempting to extend its exemption to the earnings, which would be generated by the petitioners as managers of this business, for a fee?

While the transaction was in *form* a sale of stock by the petitioners, whether or not the temple would ever receive what it purported to buy was wholly within the petitioners' control. It was incumbent upon the selling stockholders, as managers of the business, to produce the income required to pay the notes as due. In the event that petitioners did not do so, there would be a default. The only remedy in such case was the return of the business to the petitioners "including the Buyer's capital account in the business." The petitioners would get back everything.

The failure of the price to bear any relationship to the value of assets sold, the dependency of earnings on the managerial skills of the sellers, the postponement of any realization by the temple of the benefits of the sale during a 13-year payout period, coupled with the fact that when that period expired the temple would receive only one-half of what remained, lead inescapably to the conclusion that the transaction was in substance an agreement by the temple to lend its tax exemption to the petitioners for a period of years in exchange for a share in the tax savings resulting therefrom. These facts make this case distinguishable from *Commissioner* v. *Brown, supra.*

While we recognize the right of taxpayers to cast their plans in such manner as to minimize their tax liabilities, it is equally axiomatic that such plans must have substance in order to achieve the intended result. To treat the transaction presented in this case as a sale of a capital asset would be wholly inconsistent with the realities of the

situation. While it is true, as petitioners argue, that the Congress did not enact legislation which would prevent a religious organization from going into the dress business without losing its exemption, on the record before us it is our conclusion that the temple never really acquired the dress business. The incidence of taxation must depend on the substance of the transaction and not its form. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945); *Higgins* v. *Smith*, 308 U.S. 473 (1940); and *Gregory* v. *Helvering*, 293 U.S. 465 (1935). When looked upon in that light, it is our conclusion that the transaction did not result in the sale or exchange by petitioners of a capital asset within the meaning of section 1222(3).

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

FAY, *J.*, dissenting: I agree with the substance of Judge Hall's dissent. I can see no distinction between *Clay Brown* and the instant case, and would conclude that a sale has occurred and that petitioners are entitled to capital gain or capital loss treatment. However, assuming that the majority is correct in its conclusion that the purchase price is excessive, I cannot agree that all amounts received by petitioners should be taxed as ordinary income. Petitioners have technically disposed of their entire interest in Kitro and Marilyn. The fact that petitioners might potentially recover their proprietary interest due to an ultimate default by the buyer does not negate the existence of a present sale. See *Commissioner* v. *Brown*, 325 F.2d 313, 316 (C.A. 9, 1963). Accordingly, I believe that petitioners are entitled to section 1222(3) or section 1222(4) treatment as to that portion of the purchase price which is not deemed to be excessive. In this context, there is analogous authority for characterizing only the "excessive" portion of the purchase price as ordinary income. See *Roy J. Champayne*, 26 T.C. 634 (1956); see also *Goldstein* v. *Commissioner*, 298 F.2d 562 (C.A. 9, 1962), affirming a Memorandum Opinion of this Court.

DRENNEN, *J.*, agrees with this dissent.

---

HALL, *J.*, dissenting: I respectfully dissent. The majority does not find that the transaction between the petitioners and the temple was a sham, or that there was reason to believe that the purchase price could not be met from the earnings of the business. In fact, during the years in issue the scheduled payments were made (except for certain limited amounts petitioners permitted to be withheld to be used in the business) out of the more than adequate earnings of the

business. Contrast *Kolkey* v. *Commissioner*, 254 F. 2d 51 (C.A. 7, 1958), affirming 27 T.C. 37 (1956).[1]

If I am correct in reading the majority opinion as not holding that the transaction was a sham, the only legitimate distinction between the facts in the current case and those in *Commissioner* v. *Brown*, 380 U.S. 563 (1965), is the greater extent here of the inferred excess [2] of the purchase price over fair market value.[3] The Supreme Court noted in *Brown* that the appraised value of the business relied upon by buyers and sellers was $1,064,877 against the sales price of $1,301,989.

The price for the stock in the present case appears to be about twice its fair market value. This is not the first case to involve this much price disparity. The price paid in *Union Bank* v. *United States*, 285 F. 2d 126 (Ct. Cl. 1961), namely $2,050,000 plus book value of the assets, was double the fair market value of $1,174,006.23. The Court of Claims said (p. 128): "The fact that a purchaser of an asset pays more for it than it is worth does not, of itself, convert the sale into something other than a sale, for tax purposes."

In a court-reviewed decision, *Clay B. Brown*, 37 T.C. 461, 485 (1961), this Court stated:

It may be, as respondent contends, that petitioner would have been unable to sell the stock at as favorable a price to anyone other than a tax-exempt organization. This fact does not indicate that there was no business purpose in the sale. As the Court stated in *Gregory* v. *Helvering, supra*, "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." Certainly, the right of a taxpayer by legal means to increase the amount received from a transaction over what he might have received from a different transaction is fundamental. So long as a sale to an exempt organization of stock in a corporation engaged in a commercial business is legal, such a sale, where it is in substance as well as in form a sale, is not to be ignored for tax purposes solely because the exempt organization is willing to pay a somewhat higher price than someone else might pay.

We then went on to quote with approval at page 487 the following unequivocal language in *Union Bank* v. *United States, supra:*

From the standpoint of the Goldenbergs, they were, before the 1951 transaction, the owners of valuable properties and a valuable going business. * * * After the 1951 transaction the Goldenbergs had no interest in these assets, except a security interest, the power to take them back in case of default in payment for them. If they increased in value because of general prosperity or business success, or in dollar value because of inflation, the Goldenbergs would get no part of that important incident of ownership. * * *

---

[1] In *W. H. Truschel*, 29 T.C. 433, 440 (1957), the Tax Court described the purported sale in *Kolkey* as "only a sham."

[2] I note that such excess rests on a conclusory finding of fact, unsupported by any subsidiary findings.

[3] The majority's reliance on the importance to the business of petitioners' continued managerial services overlooks the fact that in *Brown* it was also found necessary to insure, through an employment contract, the continued management of the operating company by Mr. Brown.

We think it is logically and legally impossible for an owner to part with his property, for a consideration, without selling it. The consideration which he gets for parting with his property is not income from the property, but is the price of his parting with the property.

Were it not for the subsequent opinions in the *Brown* case, I would see no reason for the Court to repudiate the views expressed in our own opinion in *Clay Brown* and in *Union Bank* merely because the purchase price in the present case was higher than a nonexempt purchaser would probably have been willing to pay. The majority herein finds that the Supreme Court opinion in *Brown* warrants our holding that the greater purchase price changes the result. As I see it, the critical question is whether there is anything in the Ninth Circuit or Supreme Court opinions in the *Brown* case which requires us to repudiate the views expressed in our own opinion in *Clay Brown* and by the Court of Claims in *Union Bank*.

The Ninth Circuit assumed the price in *Brown* was excessive, and, nonetheless, held for the taxpayer. Judge Duniway in his opinion for the Ninth Circuit (*Commissioner* v. *Brown*, 325 F. 2d 313, 316 (C.A. 9, 1963)) stated:

> There is no question that this transaction took the form that it did because the Institute is a tax-exempt corporation and that the price to be paid was probably greater for that reason.

The Supreme Court referred to the statement in the Tax Court opinion that the sales price was "within a reasonable range in the light of the earnings history of the corporation and the adjusted net worth of its assets." *Commissioner* v. *Brown*, 380 U.S. 563, 569 (1965). In my opinion, the Supreme Court's discussion of this point is not alone sufficient to justify the conclusion that the mere existence of a higher price than a nonexempt buyer would have paid is enough to upset a sale, as long as it is not sham.[4]

In the first place, it is clear that there was in the present case a realizing and recognizing disposition of stock in exchange for a cash consideration. The Supreme Court's reliance on *LeTulle* v. *Scofield*,

---

[4] Indeed, Mr. Justice Goldberg so stated in his dissenting opinion, as follows (*Commissioner* v. *Brown*, 380 U.S. 563, 588–589 (1965)):

"Although the Court implies that it will hold to be 'sales' only those transactions in which the price is reasonable, I do not believe that the logic of the Court's opinion will justify so restricting its holding. If this transaction is a sale under the Internal Revenue Code, entitling its proceeds to capital gain treatment because it was arrived at after hard negotiating, title in a conveyancing sense passed, and the beneficial ownership was expected to pass at a later date, then the question recurs, which the Court does not answer, why a similar transaction would cease to be a sale if hard negotiating produced a purchase price much greater than actual value. * * *"

It can be argued that the existence of such a higher price, in the case of a nonsham sale, would not even furnish a basis for treating a portion of the purchase price as ordinary income on the ground that such price is based upon an attribute possessed by the buyer independently of any consideration or benefit emanating from the seller. The possibility of an allocation is adverted to by Mr. Justice Harlan in his concurring opinion in *Brown*. See 380 U.S. at 580–581. No issue as to allocation was presented herein.

308 U.S. 415 (1940), and *Marr* v. *United States*, 268 U.S. 536 (1925), in *Brown* (380 U.S. 563, 574–575) underscores the fact that the tax law simply does not have a category of bona fide dispositions of property for cash which are not sales.

Secondly, the Supreme Court's statement (380 U.S. 563, 579) that new doctrines in this area should be left to Congress to initiate is fully applicable here. Following the *Clay Brown* decision, the Treasury Department proposed legislation to avoid the consequences of that decision, and that proposal was eventually enacted by the Congress.[5] At the time of the Treasury proposal, there had already been some cases in which the purchase price substantially exceeded the fair market value of the business sold. Yet, the Treasury proposal, as well as the legislation ultimately enacted, drew no distinction between the cases in which the purchase price equaled or exceeded the fair market value. In all cases, the seller was allowed to continue to treat the transfer as a sale; the attack was on the tax consequences for the purchasing exempt organization. Congress may have thought that the seller should not be denied capital gains treatment of the sale merely because someone else was willing to pay more for the business. Furthermore, Congress made the new rules applicable to all exempt organizations beginning with the year 1972, but chose not to make them applicable to a transaction such as is involved in this case prior to that year.

The Supreme Court emphasized that the term "sale" in the tax law was not a word of art, but was to bear its generally accepted meaning of "a transfer of property for a fixed price in money or its equivalent" (380 U.S. 563, 571). See *Helvering* v. *Flaccus Leather Co.*, 313 U.S. 247, 249 (1941). Clearly, the transaction here meets that definition and the majority opinion, contrary to the Supreme Court's precept, is for the first time launching a new "for tax purposes only" construction of the word "sale."

I conclude that the Supreme Court's reasoning not only does not require us to repudiate our previous agreement with the principle set forth in the *Union Bank* case and the views which we expressed in *Clay Brown*, but that the reasoning underlying the Supreme Court's holding in *Brown* confirms the correctness of that principle and these views.

The majority also relies on Rev. Rul. 66–153, 1966–1 C.B. 187, which purports to limit the holding of *Brown* to cases where the purchase price did not exceed fair market value. This self-serving ruling,

---

[5] Sec. 514, enacted as sec. 121(d) of the Tax Reform Act of 1969. See Tax Reform Studies and Proposals, U.S. Treasury Department, part 3, 91st Cong., 1st Sess., pp. 306–309 (Comm. Print 1969); H. Rept. No. 91–413 (Part 1), 91st Cong., 1st Sess., pp. 45–46 (1969); S. Rept. No. 91–552, 91st Cong., 1st Sess., pp. 62–63 (1969).

however, cites no authority for its position and further overlooks the fact that the *Brown* case itself involves a sales price in excess of cash fair market value.

FORRESTER, FAY, TANNENWALD, SIMPSON, and STERRETT, *JJ.*, agree with this dissent.