CYNTHIA SCHAEFER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Schaefer v. Commissioner
Docket Nos. 2180-76; 3937-76; 10610-76
United States Tax Court
T.C. Memo 1980-440; 1980 Tax Ct. Memo LEXIS 142; 41 T.C.M. (CCH) 100; T.C.M. (RIA) 80440; September 30, 1980, Filed J. Michael Schaefer, for the petitioners in Docket Nos. 2180-76 and 3937-76. Thomas F. Greaves, for the petitioners in Docket No. 10610-76. Kevin m. Bagley, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies in petitioners' income tax, plus additions to the tax under section 6653(a) for disregard of rules and regulations, as follows: Petitioner
Docket No.
Year
Deficiency
Sec. 6653(a)
Cynthia Schaefer
2180-76
1973
$1,371
0
John M. Schaefer
3937-76
1969
4,278 [2]
0
1973
1,371
Edward and Susan
10610-76
1972
7,757
$ 388
Cherlin
1973
7,413
371
*143 Due to concessions by the parties, the issues remaining for decision are: [3]
1. Whether the sale and leaseback of the Hermosa Hotel and Catalina Cottages was a bona fide transaction for federal tax purposes. 2. Whether petitioners in Docket No. 10610-76 are entitled to a $1,167 investment tax credit in 1972. 3. Whether petitioners in Docket No. 10610-76 are entitled to deduct 1973 interest expenses in excess of the amount allowed by respondent. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. At the time they filed their petitions, Cynthia Schaefer, Susan Cherlin and Edward Cherlin ("Cherlin"), resided in California. [4]John Schaefer ("Schaefer") resided in Nevada when he filed his petition. Schaefer is an attorney and a real estate investor. Cherlin is a pyschiatrist. *144 Schaefer and Cherlin (sometimes hereinafter referred to as petitioners) first met in 1955 when they were classmates in a San Diego high school. They have remained friends since that time and Schaefer has served as Cherlin's attorney on various occasions. The Hermosa Hotel and Catalina Cottages ("Hermosa Hotel") is a 25,000 square foot parcel of improved commercial real estate located in the City of Avalon, on the island of Catalina, 26 miles off the coast of Los Angeles. The hotel complex consists of a three-story wooden hotel building constructed between 1895 and 1900, and a number of separate one-story wooden cottages constructed during the 1930s. The hotel property is unique because of its location in Avalon, its proximity to the beach, its size and its commercial zoning. On March 21, 1969, Schaefer purchased the Hermosa Hotel from the Rosin family for $200,000. Schaefer paid $20,000 down and executed a first trust deed note ("the Rosin note") for the remaining $180,000. The Rosin note required annual payments of $10,000, due March 15, plus prepaid interest of 6 percent on the outstanding balance. After purchasing the hotel Schaefer appealed to the Los Angeles County *145 Assessor's office and obtained a reduction in the property tax appraisal from approximately $180,000 to $156,000. During his ownership Schaefer either hired managers to operate the hotel or leased it to third parties to operate. The Hermosa Hotel turned out to be a financial disappointment and a major headache to Schaefer. The hotel barely produced enough income to cover the payments required by the Rosin note. [5] Moreover, this income was generated during the summer season, some three months after the March 15 due date for the payments. The combination of these two factors required Schaefer to obtain short-term bank loans to make payments on the Rosin note. On at least one occasion foreclosure notices were filed due to delinquent payments on the Rosin note. By 1972 Schaefer wanted to sell the hotel and began searching for someone to purchase it. [6]
*146 Cherlin entered the private practice of medicine in 1971. By the following year he actively sought passive real estate investments in order to "shelter" some of his professional income. Cherlin relied on others to bring to his attention potential investments due to his lack of expertise in these matters. In 1972 Schaefer recommended to Cherlin that he purchase a Rodeway Inn motel about to be auctioned in a bank-ruptcy proceeding. Cherlin relied on Schaefer's advice and submitted a $1,710,000 bid on the Rodeway Inn which the bank-ruptcy court accepted. The acquisition never materialized, however, due to his inability to obtain financing. Schaefer continued to look for real estate investments for Cherlin which were passive in nature. In December 1972 Schaefer talked to Cherlin about the Hermosa Hotel. On December 31, 1972, Schaefer and Cherlin executed a document entitled Contract Sale and Leaseback of Real Property (hereinafter referred to as the "sale/leaseback agreement"). The terms of this sale/leaseback agreement provided, in pertinent part: CONTRACT SALE AND LEASEBACK OF REAL PROPERTY EDWARD A. CHERLIN and SUSAN G. CHERLIN, hereinafter referred to as Cherlins, and *147 J. MICHAEL SCHAEFER and CYNTHIA R. SCHAEFER, hereinafter referred to as Schaefers, do hereby agree as follows: 1. Cherlins do purchase that business and real property commonly known as Hermosa Hotel & Catalina Cottages, Avalon, California, from Schaefers, for the sum of $200,000. Cherlins to pay nothing down, issue to Schaefers a promissory note [hereinafter referred to as the Cherlin note] for full amount, and to pay during 1972 the entire 1973 interest due on said note. Note is payable interest-only, 8%, with $10,000 annual reductions to be made in December annually, excluding 1972. 3. Said property is now valued by the County Assessor of Los Angeles County at $156,000. Transaction will not be recorded, to avoid inviting reassessment of the property * * *. 4. Cherlins are given the right to resell the property to Schaefers, if they wish, for $200,000, with Schaefers paying cash for whatever equity Cherlins accumulate from annual payments on their $200,000 Note. If Cherlins sell to anyone other than Schaefers, the price must be at least $240,000 and they will assign to Schaefers $40,000 of proceeds of such resale, there being a $40,000 speculative profit eventurally *148 [sic] due Schaefers. 6. Schaefers do hereby leaseback these same promises, on a year to year basis, and have the following requirements: a. Schaefers may sublet to any operator of their choice, on terms and conditions suitable to Schaefers; b. Schaefers to pay all operating expenses, plus real estate taxes and fire insurance premiums, to assume full control of premises and to hold Cherlins harmless in all respects from any liability or claims arising out of the business; c. Cherlins rights are limited to physical entry and inspection not more than once in any 6 month period, to assure themselves that Schaefers are maintaining proper condition of the business; d. Schaefers to pay to Cherlins the 1st $10,000 in operating profits, and to guarantee Cherlins a $10,000 minimum. [7] Schaefers to share 50-50 with Cherlins any net profits, after payment of all expenses except liens & interest, exceeding $20,000 in a calendar year. [8] *149 Cherlin signed the above agreement relying solely on Schaefer's recommendation. Schaefer prepared the agreement and none of its terms were the subject of prior negotiations between the parties. Cherlin did not examine the financial statements of the Hermosa Hotel, did not look at the property and did not have it appraised before he signed the agreement. Schaefer arranged the sale/leaseback transaction to finance the payments due under the Rosin note while he searched for a potential purchaser of the hotel. Schaefer used the money received from Cherlin to alleviate the cash flow problem resulting from the disparity between the March 15 payment dates and the summer-peak seasonal business of the hotel. Cherlin, on the other hand, entered the sale/leaseback transaction for the anticipated tax benefits. On December 31, 1972, Cherlin paid $16,000 to Schaefer as prepaid interest on the $200,000 Cherlin note. In December 1973 Cherlin again paid $16,000 to Schaefer as prepaid interest, but the $10,000 principal payment then due on the Cherlin note was deferred at Cherlin's request because of liquidity problems. Cherlin subsequently paid a $10,000 principal payment in 1974. In 1973 *150 Schaefer paid Cherlin the minimum rental ($10,000) under the sale/leaseback agreement. In December 1972 Schaefer approached David Lewis ("Lewis") and Eugene Therieau ("Therieau") regarding the possibility of operating and managing the Hermosa Hotel. On January 3, 1973, Schaefer, Lewis and Therieau executed a Hotel Lease which provided, in pertinent part, as follows: HOTEL LEASE
This lease is between J. Michael Schaefer and Cynthia R. Schaefer, husband and wife, of San Diego, California, herein called LESSORS, and David Lewis and Eugene E. Therieau, Jr., of San Diego, California, therein [sic] called LESSEES. 1. DESCRIPTION OF PREMISES Lessor leases to lessee, and lessees hire from lessors, as herein provided, the premises known as the Hermosa Hotel and Catalina Cottage * * *. 2. TERM The term of this lease is one (1) year beginning January 1, 1973, and running to January 1, 1974. The lessees shall have options to renew this lease for two (2) additional one (1) year periods as set out hereinafter. 3. COMPENSATION Lessees agree to pay lessors sixty-six (66) per cent [9]/ of all net income realized from the operation of the leased hotel and units which *151 shall be computed by subtracting from the gross revenue all operating expenses, expenses for insurance, including fire insurance, and all real property taxes assessed against the leased premises, but all lien payments and all capital improvements shall be paid by lessors and shall not be a deduction from gross revenue in arriving at net profit. Lessees shall receive all net profit not paid to lessors as set out hereinabove. 4. LOSSES Any net operating loss computed in the same manner as set forth in paragraph 3 above for computation of net operating profit, shall be shared equally between lessors and lessees, i.e. fiftty [sic] (50) per cent by lessors and fifty (50) per cent by lessees. 10. OPTION TO PURCHASE DEMISED PREMISES Lessors hereby grant to lessees an option to buy the leased premises at any time lessees may elect during the term of the lease including any extended term resulting from the exercise of any option right granted herein. Said option to purchase shall be at a sale price of two-hundred-forty-thousand dollars ($240,000) with five-thousand dollars ($5,000) cash down payment. *152 Lessees shall assume any existing assumable lien against the property and lessors shall take back a lien, with the demised property as security for the difference between the selling price, less the down payment and less the amount of any lien assumed by lessees as set forth herein. Therieau prepared the Hotel Lease except for minor modifications. Both he and Lewis requested that the lease contain an option to purchase the hotel. The inclusion of the option was a point negotiated among the parties. Although Schaefer informed both Therieau and Lewis that Cherlin, not he, owned the property, he indicated that he would be able to deliver the property should they exercise the purchase option. Therieau and Lewis recorded the Hotel Lease with the Los Angeles County Recorder on August 30, 1973. In October 1973 they notified Schaefer of their intention to renew their lease on the Hermosa Hotel. In June 1974 Therieau informed Schaefer in writing that he and Lewis intended to exercise their purchase option under the Hotel Lease. [10]Schaefer advised Cherlin to transfer the Hermosa Hotel back to him for the $200,000 amount stated in the sale/leaseback agreement. Cherlin followed *153 this advice and on November 20, 1974, he signed an agreement recoveying the property to Schaefer. The agreement required Schaefer to pay Cherlin $10,000, the amount of principal previously paid by Cherlin on the $200,000 Cherlin note. Additionally, the agreement provided that until December 1, 1974, Cherlin could sell the Hermosa Hotel to any other party for a price exceeding $240,000; the agreement further provided that in the absence of a pre-December 1 sale, the transfer to Schaefer would become effective on December 31, 1974. Cherlin did not exercise his right to sell and, consequently, on or about December 31, 1974, Schaefer sold the Hermosa Hotel to Therieau and Lewis. Both Schaefer's and Cherlin's federal tax returns filed for 1972 and 1973 reflected the sale/leaseback transaction. Schaefer reported $16,000 of interest income *154 in both years and deducted depreciation in 1972 but not in 1973. In 1973 Schaefer reported gross income from the Hermosa property of $12,000 and deducted from this amount the $10,000 lease payment to Cherlin. [11] On his 1972 joint tax return Cherlin reported a $20,000 net loss from the operations of the Hermosa Hotel and claimed a $1,167 investment tax credit relating to the hotel's furnishings. On his 1973 joint tax return Cherlin reported a $18,917 net loss from the Hermosa Hotel. [12]
In 1971 Cherlin borrowed $3,068 from San Diego Federal Savings and Loan Association at an annual rate of 12,83 percent. In calculating the 48 monthly installments due on the loan, the bank added the *155 interest which would accumulate over the life of the loan, $870.40, to the principal amount and divided this sum by the 48 monthly installments to be made. This calculation resulted in equal monthly payments of $82.05. Cherlin made 23 installment payments on this loan before paying it off on September 19, 1973. At that time the outstanding balance on the loan was $2,051.25, but due to the accelerated payment Cherlin was able to pay off the loan for $1,810.71. On his 1973 joint tax return Cherlin deducted $629 of interest relating to this loan. This amount represented the entire interest actually incurred by Cherlin over the life of the loan. In 1972 Cherlin deducted no interest relating to the loan. In his statutory notices in Docket Nos. 3937-76 and 10610-76, respondent determined that the transaction between Schaefer and Cherlin was not a bona fide sale/leaseback. Accordingly, respondent treated the $16,000 payments received by Schaefer from Cherlin in 1972 and 1973 as loans or advances. Respondent also disallowed the $10,000 lease payment deduction claimed by Schaefer in 1973 and instead treated it as a loan repayment. Furthermore, respondent disallowed the losses from *156 the Hermosa Hotel reported on Cherlin's 1972 and 1973 joint tax returns as well as the investment tax credit claimed in 1972. Respondent also disallowed as unsubtstantiated $271 of the 1973 interest deduction relating to Cherlin's loan from the San Diego Federal Savings and Loan Association. OPINION The first issue is the bona fides of the 1972 sale/leaseback transaction between Schaefer and Cherlin. Both Schaefer and Cherlin contend that the transaction was bona fide and should be accorded the appropriate tax consequences. Respondent rebuts with two arguments. First, he maintains that the purported sale/leaseback of the hotel was a "sham" transaction, devoid of any business or economic purpose other than tax avoidance. [13] Alternatively, respondent contends that the sale/leaseback transaction is a thinly disguised financing arrangement. Under either formulation, respondent argues that, for federal tax purposes, no sale/leaseback has been effectuated.
*157 In Commissioner v. Brown, 380 U.S. 563 (1965), the Supreme Court emphasized that the concept of "sale" should be substantially accorded for tax purposes its "common and ordinary meaning" in the "non-tax world." 380 U.S. at 571. We have previously expressed our own understanding of what the Supreme Court meant in Brown: Inherent in the Court's understanding of a sale is the notion of movement through exchange, the idea that, at the conclusion of the sale, the buyer possesses that which was the object of the sale. * * * Kraut v. Commissioner, 62 T.C. 420, 428 (1974). See also Hill v. Commissioner, 63 T.C. 225, 243 (1974). Our task is to determine whether the substance of the sale/leaseback transaction comports with its form. The general principles to be applied have been stated recently by the Supreme Court: * * * In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers," Commissioner v. Tower, 327 U.S. 280, 291 (1946), *158 as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding." Helvering v. Lazarus & Co., 308 U.S. at 255. See also Commissioner v. P.G. Lake, Inc., 356 U.S. 260, 266-267 (1958); Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945). Nor is the parties' desire to achieve a particular tax result necessarily relevant. Commissioner v. Duberstein, 363 U.S. 278, 286 (1960). Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978). We hold for respondent. A close examination of the events preceding and following the December 31, 1972 sale/leaseback agreement and the economics of the transaction convince us that, for federal tax purposes, Schaefer did not sell the Hermosa Hotel to Cherlin. In no real way did Cherlin ever "possess that which was the object of the sale;" nor did Schaefer relinquish *159 continued ownership of the Hermosa Hotel. Rather, the purported sale/leaseback transaction was, in substance, a mechanism by which Schaefer obtained money to service the Rosin note while searching for a potential purchaser of the hotel properties. Our conclusion is based on the totality of the following considerations: First, the parties themselves did not respect the form of the transaction. Schaefer's dominion and control over the Hermosa Hotel was unaltered by the execution of the sale/leaseback agreement. Although the leaseback under that agreement did provide Schaefer with a great deal of latitude in his dealings with the properties, his actions went beyond those normally associated with a mere lessee. Schaefer, as sub-lessor, granted an option to purchase the hotel to Lewis and Therieau, the sub-lessees. This option was granted without the approval of Cherlin, the purported owner of the hotel.Moreover, the sub-lease agreement reduced Cherlin's interest in the hotel's operating income without his approval. The leaseback agreement provided for Cherlin to receive the first $10,000 in profits, Schaefer the next $10,000, and the parties to split any net profits above $20,000. *160 The sub-lease agreement, however, provided for Schaefer to receive only two-thirds of the net profits. Consequently, Cherlin would not be entitled to any additional profits until the hotel generated at least $30,000 of net profits and even then he would receive only one-third of those additional profits instead of one-half. Second, Cherlin made no real economic investment in the Hermosa Hotel nor did he intend to make any such investment. Cf. Estate of Franklin v. Commissioner, 544 F. 2d 1045, 1048 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Hilton v. Commissioner, 74 T.C. 305, 350 (1980); Hill v. Commissioner, 63 T.C. 225, 245 (1974). The sale/leaseback agreement provided for no initial payment by Cherlin in 1972, the year of "purchase", and $10,000 annual principal installments thereafter. The agreement further provided Cherlin with a "put" option to resell the property to Schaefer at any time for the original purchase price of $200,000, with Cherlin receiving cash for the amount of "equity" he had built up to that time. The combination of these two factors, in light of the circumstances surrounding the entire *161 transaction, indicates that any investment by Cherlin was intended to be, at best, temporary. In fact, the offsetting effect of the $10,000 lease payments and the $10,000 principal installments required under the sale/leaseback agreement makes it questionable whether Cherlin's "investment" was intended to be even temporary. We do not believe it is coincidental that the minimum lease payments payable by Schaefer equal the $10,000 principal payments required of Cherlin. [14]
Third, the sale/leaseback agreement did not transfer the burdens and benefits of ownership of the hotel. See Estate of Franklin v. Commissioner,64 T.C. 752, 768, 769 (1975), affd. 544 F. 2d 1045 (9th Cir. 1976). The sale/leaseback left Schaefer in the same position vis a vis the hotel properties as he occupied prior to the agreement. The simultaneous leaseback of the hotel and the unbridled discretion vested in Schaefer to sublet the *162 property permitted him to continue to operate the property in the same manner as before, namely, through lessees or managers. Schaefer continued to be liable under the lease for the payment of the Rosin note, real estate taxes and fire insurance premiums. In addition, the lease required Schaefer "to assume full control of the premises and to hold Cherlins harmless in all respects from any liability or claims arising out of the business." [15]
Moreover, when the sale/leaseback is viewed in a realistic light it becomes apparent that none of the economic benefits or burdens of ownership were transferred between the parties. The operating history of the hotel indicates that Cherlin could not reasonably expect to receive more than the $10,000 guaranteed annual lease payments. For Cherlin to receive more, the hotel would have had to generate net profits exceeding $30,000 per year after taking into account the portion of the net profits going to Therieau *163 and Lewis under the sub-lease. There is nothing in the record that indicates that this was a plausible possibility. Schaefer testified that during his years of ownership the hotel generated barely enough income for him to service the Rosin note, i.e., approximately $20,000. In 1972, the only year for which we have complete figures, Schaefer reported grossreceipts from the hotel of only $14,315. Furthermore, Schaefer, not Cherlin, bore all the risk of current operating losses. Nor did the sale/leaseback transfer any of the long-term economic risks associated with the property. On the downside, the sale/leaseback agreement shielded Cherlin against any risks due to the "put" option to resell to Schaefer. Although on brief petitioners attempt to dispel the risk-free nature of the transaction by proposing the hypothetical of Schaefer becoming insolvent and being unable to repurchase, petitioners introduced no evidence at trial to convince us that such a situation was a real risk. On the upside, the sale/leaseback agreement provided that the first $40,000 of profit would inure to Schaefer's benefit and that Cherlin could only sell the Hermosa Hotel for a minimum of *164 $240,000. Petitioners argue, and we agree, that it is possible that Cherlin could have reaped a profit if the property were sold for more than $240,000; however, under the facts of this case, we believe Cherlin never contemplated retaining the property for appreciation purposes once Schaefer found a buyer at $240,000. Rather the record clearly supports the conclusion that it was Schaefer who decided when, and if, the hotel would be sold.By the time the sale/leaseback agreement was executed on December 31, 1972, Schaefer was engaged in negotiations with Lewis and Therieau regarding the sub-lease of the hotel.Part of those sub-lease negotiations involved the $240,000 purchase option eventually incorporated into the sub-lease agreement and eventually exercised by Lewis and Therieau. Moreover, the only party actively seeking potential purchasers for the property was Schaefer. [16]Schaefer, however, had no incentive to sell the Hermosa Hotel for an amount exceeding $240,000 since any excess would be payable to Cherlin. *165 Petitioners contend, however, that Cherlin, as owner of the property, was under no compulsion to follow Schaefer's advice as to when to sell the property but rather Cherlin could have held the property for appreciation purposes. In essence, petitioners argue that Cherlin had veto power over any proposed sale.If anyone possessed a veto power it was Schaefer since he held recorded title to the property; it is incredible that a purchaser would buy a piece of real property without obtaining good title. [17] Furthermore, given Cherlin's lack of expertise and his desire to have passive investments, Schaefer could virtually force Cherlin to reconvey the property to him by simply terminating his role as lessee under the leaseback agreement. Finally, petitioners' position assumes that Cherlin exercised independent judgment in matters concerning the Hermosa Hotel. Although Cherlin testified to that effect, we found his testimony incredible. The cumulative effect of the following events leads us to conclude that in his dealings with the Hermosa Hotel, Cherlin substituted Schaefer's judgment for his own. Schaefer conceived of the sale/leaseback and prepared the agreement. Cherlin signed *166 that agreement without negotiating any of its terms; he did not examine the property, have it appraised, or examine the books and records of the hotel. When Schaefer recommended that Cherlin resell the hotel to him, Cherlin followed this advice thereby enabling Schaefer to satisfy the purchase option exercised by Lewis and Therieau. [18]Cherlin's complacence in Schaefer's delivery and recordation of an option at $240,000, almost concurrent with the original "sale", combined with Schaefer's retained right to all profits on the sale up to that point make it clear that Cherlin's upside possibilities were as illusory as was his downside risk in view of the $200,000 put. The essence of the deal was Schaefer's continued retention of the practical benefits and burdens of ownership, coupled with a rather transparent attempt to provide some tax benefits for Cherlin. *167 The true relationship between Schaefer and Cherlin was clearly demonstrated when Schaefer indicated to Lewis and Therieau that he would be able to deliver the Hermosa Hotel to them if they exercised the purchase option contained in the Hotel Lease. As a consequence of Schaefer's complete practical domination regarding the affairs of the hotel, and Cherlin's total unconcern with what was done, we do not attach any significance to the remote, hypothetical possibility that Cherlin would have retained the hotel for appreciation purposes. [19]
In our view the transaction between Schaefer and Cherlin was a mere financing arrangement. The nub of the transaction can be ascertained by following the cash due to change hands pursuant to the sale/leaseback agreement. The agreement called for Schaefer to receive $26,000 in the first full year ($10,000 principal repayment plus $16,000 prepaid interest) and reduced amounts thereafter (due to the 8 percent interest being applied to a lower outstanding balance). [20]Schaefer, however, had to return $10,000 of this amount to Cherlin in the form of the annual lease payment. (The difference between the gross *168 amounts received by Schaefer minus the lease payments will hereafter be referred to as his "net inflow.") It is not coincidental that the net inflow due Schaefer under the agreement ($16,000 in 1973 and reduced amounts thereafter) approximates the amount required to be paid by Schaefer on the Rosin note. The cost to Schaefer of financing the Rosin note payments via the sale/leaseback arrangement was significantly less than it would have been if Schaefer had continued to obtain short-term bank loans. Unlike the shortterm bank loans whereby Schaefer was obligated to immediately repay not only principal but interest, the sale/leaseback arrangement only required Schaefer to "repay" to Cherlin $10,000 of his net inflow when the hotel was eventually sold. [21] The difference between the net inflow to Schaefer and this $10,000 was "free" money. Moreover, under the sale/leaseback arrangement no interest accrued on the entire net inflow. The combination of this "free" money, deferred repayment and no interest represented a significant saving to Schaefer in servicing the Rosin note. [22]
*169 Petitioners emphasize the existence of several business purposes behind the sale/leaseback in an attempt to imbue the transaction with substance. However, an examination of the purported business reasons for the transaction readily exposes their transparency. Schaefer testified that he had four reasons for selling the Hermosa Hotel: (1) to limit his holdings to the San Diego area; (2) to enhance his balance sheet; (3) to satisfy a "moral" obligation he felt toward Cherlin after the Rodeway Inn purchase fell through; and (4) to alleviate his liquidity problem in meeting the payments due under the Rosin note. Only the last of these reasons passes scrutiny and that reason is consistent with our view that the entire transaction was merely a financing arrangement. Schaefer's consolidation theory is inconsistent with his contemporaneous ownership of a farm in La Plata, Maryland, clear across the continent. As discussed, supra, Schaefer's purported disposal of the property left him in the same position vis a vis the property as he occupied previously. If, as Schaefer alleges, the consolidation was intended to simplify the management of his portfolio, we do not see how the sale/leaseback *170 achieved that purpose. The other two purported reasons are simply unbelievable in light of Schaefer's generally incredible testimony. We are unconvinced that the balance sheet substitution of one long-term asset (the hotel) for another (a note receivable from Cherlin) [23] or Cherlin's failure to obtain the Rodeway Inn motivated Schaefer to engage in the sale/leaseback transaction. Nor do Cherlin's purported reasons for entering the sale/leaseback transaction give it substance. Cherlin testified that he had three reasons for buying the Hermosa Hotel: (1) to obtain current income; (2) to obtain long-term appreciation; and (3) to shelter some of his other income. The record indicates that the Hermosa Hotel had a history of generating very little, if any, profit. [24] Furthermore, whatever profits were generated had to be shared with Schaefer, Lewis and Therieau. The combination of these factors and the payments required to be made by Cherlin pursuant to the sale/leaseback agreement, made it extremely unlikely that the hotel would generate *171 any current income or any positive cash flow to him. Similarly, as previously discussed, the prospect of any long-term appreciation accruing to Cherlin was never contemplated by the parties. This leaves the tax benefits as the only credible reason for Cherlin's purchase of the Hermosa Hotel. This reason alone, however, is not sufficient to justify upholding the substance of the transaction.Cf. Hilton v. Commissioner, supra at 350. In summary, as we view the entire record, the sale/leaseback agreement--when read in light of all the facts--is incompatible with a sale. At most the agreement was a financing arrangement whereby Schaefer obtained funds to service the Rosin note. [25] Accordingly, all the tax consequences flowing from the sale/leaseback transaction to both Schaefer and Cherlin must be corrected. These include the depreciation deductions claimed by Cherlin, the investment tax credit claimed by *172 Cherlin, the interest deductions claimed by Cherlin on the purported purchase price, the receipt of those payments by Schaefer, the lease payments made by Schaefer, and the receipt of those payments by Cherlin. The final issue [26] is the appropriate amount of interest expense deductible by Cherlin in 1973 on a loan held by San Diego Federal Savings and Loan Association. On brief, Cherlin concedes that the amount of the reported interest deduction ($629) allowed by respondent ($358) exceeded the actual amount of interest paid on the loan in 1973 ($177.25). Despite this concession, Cherlin argues that he is entitled to the entire $629 deduction originally reported because he failed to deduct the 1971 or 1972 interest payments in those years. (The sum of the 1971, 1972 and 1973 interest payments on the loan is $629.) Alternatively, Cherlin contends he is entitled to a credit or refund for 1972 relating to interest paid in 1972 but not previously deducted. [27] Respondent maintains that Cherlin is not entitled to an interest deduction in 1973 exceeding the amount previously allowed and that Cherlin *173 has failed to properly raise the issue pertaining to the 1972 deduction.
Section 163 permits a deduction for interest paid or accrued within the taxable year. Cherlin concedes that he did not pay a greater amount of interest in 1973 than the amount allowed by respondent and, accordingly, he is not entitled to any greater deduction for that year. However, Cherlin should be given credit for the interest paid in 1972 but not deducted in that year. Although the issue was *174 not technically raised in a timely fashion, see Rule 34(a), Tax Court Rules of Practice and Procedure, the interest payments on the loan were generally before the Court as a result of respondent's 1973 disallowance. Cf. Rule 41(b)(1), Tax Court Rules of Practice and Procedure. Moreover, we do not believe respondent will be substantially prejudiced by our consideration of Cherlin's claim especially in light of the documentary evidence presented. The evidence introduced at trial is sufficient to ascertain the amount of interest paid in 1972. [28] As Cherlin readily concedes, respondent allowed a greater interest deduction in 1973 than the amounts he actually paid. This excess amount should be subtracted from the amount of interest paid by Cherlin in 1972 in computing the 1972 interest deduction allowable to Cherlin pursuant to this opinion. To reflect the foregoing, *175 Decisions will be entered for petitioners in docket Nos. 2180-76 and 3937-76. Decisions will be entered under Rule 155 in docket No. 10610-76. Footnotes
1. Cases of the following petitioners have been consolidated for purposes of trial, briefing and opinion: John M. Schaefer, Docket No. 3937-76; Edward A. Cherlin and Susan G. Cherlin, Docket No. 10610-76.↩
2. The tax year 1972 is also involved in Docket No. 3937-76 because of various disallowed deductions which offset the claimed loss carryback to 1969.↩
3. Among the concessions made by respondent are the absence of any deficiency in Docket No. 2180-76, the absence of any deficiency for 1973 in Docket No. 3937-76 and the inapplicability of the additions to the tax in Docket No. 10610-76.↩
4. Petitioner Susan Cherlin is a party solely by virtue of having filed a joint return with her husband.↩
5. In 1972 Schaefer reported gross receipts from the Hermosa Hotel of $14,315 and a bottom line loss of $11,391. Excluding depreciation deductions, the Hermosa Hotel generated a negative cash flow in 1972 of approximately $2,000, not including the $10,000 principal payment required under the Rosin note. ↩
6. At this time Schaefer also owned several commercial properties in the San Diego area and a farm in LaPlata, Maryland.↩
7. Schaefer derived the $10,000 figure "off the top of [his] head." ↩
8. Under the agreement Schaefer continued to be obligated under the Rosin note. The agreement also called for the Cherlins to make a balloon payment of the outstanding balance on the $200,000 note when the Rosin note was repaid in full.↩
9. /↩ This percentage was subsequently changed to 66-2/3 percent.
10. The June 18, 1974 letter from Therieau to Schaefer contained the following paragraph: As you assured me during our telephone conversation, you would obtain, within thirty (30) days, a written commitment from Dr. Cherlin by which he agreed to either reconvey to yourself, or convey to the Lewis' [sic] and myself said hotel in Catalina.↩
11. The $12,000 presumably represented Schaefer's 66-2/3 percent interest under the Hotel Lease in the net profits of the hotel. ↩
12. The $20,000 net loss in 1972 resulted from the $16,000 prepaid interest payment and $4,000 additional first-year depreciation claimed on the hotel's furnishings. The 1973 net loss resulted from the $10,000 lease payment received from Schaefer under the sale/leaseback agreement minus the $16,000 prepaid interest payment and $12,917 in depreciation deductions.↩
13. Initially, we note that we agree with petitioners that tax considerations, even if they represent a major motivating factor behind a given transaction, will not vitiate an otherwise substantial transaction. United States v. Cumberland Public Service Co.,338 U.S. 451↩ (1950). Acceptance of this proposition, however, resolves nothing for it is predicated on the substance of the underlying transaction, the very question which is presently before us.
14. In fact, the illusion of Cherlin's "investment" is accentuated by the events occurring in 1973 when Schaefer paid Cherlin $10,000 under the lease but Cherlin failed to pay the $10,000 principal installment due to his cash flow problems.↩
15. Petitioners argue that Cherlin possessed the right to sell the property which is one of the basic "incidences of ownership." For the reasons stated on pages 22-24, infra↩, we believe Cherlin's right of alienation was illusory.
16. This is not surprising considering that Cherlin never visited the property, never had the property appraised and never examined the books or records of the hotel.↩
17. Even if Cherlin wanted to retain the Hermosa Hotel and sell it to a higher bidder, he could not transfer title because Schaefer retained title to the property under the sale/leaseback agreement. This retention by Schaefer assured him that Cherlin could not secretly sell the property out from under him. ↩
18. Petitioners attempt to explain Cherlin's acquiescence in Schaefer's recommendation by stating that Cherlin sold the Hermosa Hotel so that he could purchase an apartment building. This is contrary to Cherlin's testimony that he acquired the apartment building because he had sold the Hermosa Hotel.↩
19. See also note 10, supra↩.
20. The first full year of the agreement was 1973. Cherlin paid $16,000 prepaid interest to Schaefer on December 31, 1972. ↩
21. The $10,000 repayment arises from the "equity" reimbursement provision in the sale/leaseback agreement. ↩
22. Schaefer was not the only beneficiary of the sale/leaseback arrangement. Clearly, the arrangement was also intended to benefit Cherlin. Using 1973 as an example, the agreement required Cherlin to pay a total of $26,000 ($16,000 interest plus $10,000 principal installment). Due to his cash flow problems, however, Cherlin only paid $16,000. Of this amount, Cherlin was immediately reimbursed for $10,000 in the form of Schaefer's lease payment. In exchange for this net outlay of $6,000, Cherlin hoped to receive the tax benefits associated with ownership of the Hermosa Hotel, i.e↩., depreciation, investment tax credits, and interest deductions. In 1973 Cherlin claimed $18,917 in net deductions related to the Hermosa Hotel. The sale/leaseback agreement provided for a potential repetition of this benefit each year. The only difference in succeeding years would be that (1) Cherlin would presumably pay the $10,000 principal installments for which he would eventually be reimbursed when the property was sold, and (2) Cherlin's tax benefits would decline due to his use of accelerated depreciation methods.
23. Schaefer provided no substantial reasons why the balance sheet needed improvement or how the substitution would indeed improve it.↩
24. Schaefer testified that the hotel was capable of generating significant income. However, we found these vague and unsubstantiated statements incredible.↩
25. We offer no comment as to the tax consequences of this financing arrangement.↩
26. As a result of our holding the sale/leaseback ineffective for tax purposes, we need not consider whether, assuming the validity of the transaction, Cherlin would have been entitled to an investment tax credit for the purchase of the hotel's furnishings. Moreover, as a result of our view of the sale/leaseback transaction, respondent concedes that no deficiency is due from Schaefer for 1969 (Docket No. 3937-76). ↩
27. The amount of the credit requested by Cherlin is $167, the difference between the interest allegedly paid in 1972 but not deducted ($348) and the excess 1973 deduction allowed by respondent ($181).↩
28. Over the life of the loan Cherlin made 23 monthly installments of $82.03; presumably, 12 of these payments occurred in 1972. The portion of interest included in those payments can be ascertained by applying the interest rate on the loan, 12.83 percent, to the declining outstanding balance of the loan.↩