AARON KRAUT AND IRIS KRAUT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

HARRY KRAUT AND MARIAN KRAUT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7663–70, 7664–70.   Filed June 27, 1974.

*Sidney N. Solomon, Frederic Scheinfeld,* and *O. John Rogge,* for the petitioners.

*Stanley J. Goldberg* and *Walter C. Welsh,* for the respondent.

424

## OPINION

RAUM, *Judge:* This case presents a factual variation of a common transaction, the heart of which is the debt-financed acquisition of a going business by a tax-exempt organization. Prior to the Tax Reform Act of 1969, churches described in section 501(c)(3), I.R.C. 1954, which were exempt from ordinary taxation were also singled out in section 511(a)(2)(A) for relief from taxation on so-called unrelated business taxable income.[3] This provision enabled a qualified church to receive the income from the operation of a trade or business, itself unrelated to the church's exempt purpose, without incurring tax liability on the proceeds, provided the business was not conducted as a separate corporate entity.[4] Arrangements of this type held out to businessmen the prospect of relieving the tax burden on otherwise

---

[3] Part III of subch. F of ch. 1 of the Income Tax Subtitle of the Internal Revenue Code, consisting of secs. 511 through 515, extends taxation to the business income of certain exempt organizations. The critical language therein is "unrelated business taxable income," a defined term denoting income from a trade or business carried on by the exempt organization but which trade or business is not substantially related to the organization's exempt purpose. Sec. 511(a)(1) contains the operative language of part III, imposing a tax on the unrelated business taxable income "of every organization described in paragraph (2)." Sec. 511(a)(2), as effective in 1967, provided in relevant part:

(2) ORGANIZATIONS SUBJECT TO TAX.—

(A) ORGANIZATIONS DESCRIBED IN SECTION 501(c)(2), (3), (5), (6), (14)(B) or (C), AND (17), AND SECTION 401(a).—The taxes imposed by paragraph (1) shall apply in the case of any organization (*other than a church,* a convention or association of churches, or a trust described in subsection (b)) which is exempt, except as provided in this part, from taxation under this subtitle by reason of section 401(a) or of paragraph (3), (5), (6), (14)(B) or (C), or (17) of section 501(c). Such taxes shall also apply in the case of a corporation described in section 501(c)(2) if the income is payable to an organization which, itself is subject to the taxes imposed by paragraph (1) or to a church or to a convention or association of churches. [Emphasis supplied.]

The Tax Reform Act of 1969, sec. 121(a)(1), repealed the preferred status of churches in respect of unrelated business income by deleting the parenthetical exception in sec. 511(a)(2)(A).

[4] Sec. 1.511-2(a)(3)(ii), Income Tax Regs.

taxable business profits by "selling" the business to a church, which could then pass on a substantial portion of those untaxed profits to the seller as deferred payment of the purchase price, ultimately resulting in tax liability of the seller only for long-term capital gains.

In the case before us, the events of which transpired prior in time to the amendment of section 511(a)(2)(A), the Commissioner has challenged petitioners' decision to treat the payments received from Cathedral as long-term capital gains. He proposes two bases for this conclusion: First, that the totality of the dealings between the parties did not amount to a bona fide sale, without which long-term capital gain does not arise; [5] second, that in the event we find this transaction to exhibit the substance of a sale, the value of Nassau's stock was nevertheless limited to $168,445.60, and the payments which petitioners received in excess thereof were thus not "from the sale or exchange of a capital asset." To these contentions petitioners respond simply that there was a bona fide common law sale, that the agreed-upon price for Nassau's stock resulted from arm's-length negotiations between the parties and fell well within a reasonable range of values in light of Nassau's alleged potential sales volume. We, however, are not persuaded by the evidence before us that the Commissioner has erred.

It is a cardinal rule that, in characterizing a transaction for purposes of taxation, we are obliged to look beyond the form in which the parties have chosen to cast it and to draw our conclusions from that which we perceive to be the substance of the matter. *Griffiths* v. *Commissioner*, 308 U.S. 355, 357–358; *Higgins* v. *Smith*, 308 U.S. 473, 476; *Jack E. Golsen*, 54 T.C. 742, 754, affirmed 445 F. 2d 985 (C.A. 10). In particular here we must determine whether the parties effected a true sale of Nassau's stock. In its benchmark decision in this area, *Commissioner* v. *Brown*, 380 U.S. 563, the Supreme Court addressed itself to the relevant characteristics of a sale, stating (380 U.S. at 571):

"A sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent," *Iowa* v. *McFarland*, 110 U.S. 471, 478; it is a contract "to pass rights of property for money,—which the buyer pays or promises to pay to the seller * * *," *Williamson* v. *Berry*, 8 How. 495, 544. * * *

Inherent in the Court's understanding of a sale is the notion of movement through exchange, the idea that, at the conclusion of the sale, the buyer possess that which was the object of the sale. And, indeed,

<hr>

[5] SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES.
  For purposes of this subtitle—

  *    *    *    *    *    *    *

  (3) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.

this comports well with the "common and ordinary meaning" of a sale. *Commissioner* v. *Brown, supra* at 571. On the strength of this definition, the Supreme Court characterized the transaction before it as a sale, and in so doing it underscored a variety of detail which impresses us as highly significant in analyzing the facts before us.

At the outset, the Court recognized the necessity of construing the term "sale" in a manner consistent with the purpose of the capital gains provisions of the Code. That purpose is (380 U.S. at 572)—

to afford capital gains treatment only in situations "typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year." *Commissioner* v. *Gillette Motor Co.,* 364 U.S. 130, 134.

Unlike the facts in *Brown,* in which the transferred business had an adjusted net worth of $619,457.63 which included $448,471.63 of accumulated earnings, at the time of the present transaction Nassau's balance sheet showed total assets of $53,867.56, accumulated earnings of $12,348.62, and a net worth of only $12,548.62. Yet the purported sales price was a flexible figure between $500,000 and $3,500,000 as opposed to the correspondingly more realistic price of $1,300,000 in *Brown.* While the absence of accrued value is not conclusive with regard to the existence of a sale, it quite clearly demonstrates that the consideration here reflected whatever future income Nassau might produce rather than the typical capital gains situation "involving the realization of appreciation in value accrued over a substantial period of time" as was the case in *Brown.*[6] We think that such a transaction may most accurately be described as a retained proprietary interest by the shareholders in the business' future earnings rather than the creation of a creditor's interest in future earnings born of past accrued value of a capital asset. To treat such as a sale is at odds with the very purposes of the Code in allowing capital gains treatment for realization of the enhanced value of a capital asset.

The Court in *Brown* further stressed the express finding of the Tax Court that the price paid was within reasonable limits based on the earnings and net worth of the company. 380 U.S. at 572–574. In the context of a purchase to be financed entirely and exclusively from the earnings of the business acquired, this factor properly focuses attention upon what Justice Harlan referred to as the purchaser's "residual interest." *Commissioner* v. *Brown, supra* at 581 (concurring opinion). While Justice Harlan agreed with the majority's conclusion that a

---

[6] In this respect, we regard the $3 million range within which the purchase price was allowed to vary as incompatible with a sale of Nassau's past accrued value and goodwill. Rather, it is highly suggestive of an arrangement by which the Krauts retained a most substantial interest in Nassau's future profits.

sale had occurred, he offered the following analysis which we deem to be especially helpful in the case before us:

the Government might more profitably have broken the transaction into components and attempted to distinguish between the interest which [the taxpayers] retained and the interest which they exchanged. The worth of a business depends upon its ability to produce income over time. What [the taxpayers] gave up was not the entire business, but only their interest in the business' ability to produce income in excess of that which was necessary to pay them off under the terms of the transaction. The value of such a residual interest is a function of the risk element of the business and the amount of income it is capable of producing per year, and will necessarily be substantially less than the value of the total business. Had the Government argued that it was that interest which [the taxpayers] exchanged, and only to that extent should they have received capital gains treatment, we would perhaps have had a different case.

It follows therefrom that to the extent the so-called sales price is excessive, albeit agreed upon, the purchaser's residual interest is correspondingly diminished. Despite inadequacies in the record before us, there is sufficient evidence to create serious doubt in our minds that Nassau's expected earnings even approximated, no less exceeded, the level necessary to render payments to the Krauts of $3,500,000. And to the extent the clouded record precludes us from making any specific finding with reasonable confidence in this respect, we find that petitioners have failed to sustain their burden of proving that the facts were otherwise.

In urging upon us the reasonableness of the contract price, petitioners have relied heavily upon Aaron Kraut's projection of Nassau's earnings from its new Christmas wire, which valuation is supported, they argue, by the fact that Wilson Mold & Die Corp., an allegedly nonexempt corporation subject to the constraints of taxation, agreed to substantially the same terms as did Cathedral in a contract to purchase Nassau. At trial, Aaron Kraut testified that, based upon the customer acceptance of Nassau's new wire and the growing backlog of unfilled orders in the first half of 1966, he expected Nassau to yield gross profits of $10 million during the ensuing 10 years. We, however, simply do not believe this evidence. Petitioners introduced neither documentary nor other specific evidence of Nassau's allegedly skyrocketing business of early 1966. And Aaron Kraut's narrowly selective and seemingly self-serving memory rendered his testimony wholly unsatisfactory. On the one hand, he repeatedly professed his complete ignorance even of Trio's and Nassau's most general financial concerns, such as the information in tax returns which he himself had signed, explaining that his brother Harry handled all financial matters while he was engaged exclusively in the production end of the busi-

ness.[7] Yet, with respect to the central question of the case, Nassau's earning capacity over a period of 10 years, he presumed to ask the Court to rest content entirely on the strength of his knowledge of that matter. The valuation of a business is a delicate and sophisticated calculation, the more so with only 1 year's operation from which to extrapolate, and we are hardly inclined to credit Aaron Kraut with the necessary knowledge or ability to lend the slightest probative value to his testimony.

Insofar as Wilson is concerned, we are faced with unexplained silence. The record is barren of evidence with respect to Wilson. We do not know what business, if any, it conducted, who its principals were and what relationship, if any, existed between them and Cathedral or other persons involved in these transactions, and what negotiations, if any, preceded the signing of the contract. All we do know is that a party referred to as Wilson Mold & Die Corp. signed a contract to purchase Nassau's stock and 15 days later assigned the entirety of its interest in the contract to Cathedral. In the absence of any explanatory evidence (which was peculiarly within the control of petitioners) and in view of the two contracts' all too convenient timing, it is strongly suggestive the initial Wilson contract was merely a bootstrap effort to bolster petitioners' contention as to Nassau's fair market value, and we consequently must discount its evidentiary value.

In addition to petitioners' failure to produce credible evidence supporting the value they have tried to attach to Nassau, what evidence the record does provide in respect of this issue compels us to conclude that petitioners have failed to show that the contract price of as much as $3,500,000 was not grossly excessive. Nassau was a company which, in its 1 year of existence, had managed to generate profits of less than $16,000 before taxes, with total assets amounting to slightly more than $50,000 and a net worth of $12,548.62. Its only fixed asset was an automobile. Its sole product was still experimental in June of

---

[7] Another instance of Aaron Kraut's remarkably inconsistent memory arose in respect of the sale of Christmas Wire, an event no more than 8 years past at the time of trial. He at first professed to have no recollection whatever of the purchase price, but after persistent questioning by the Court, prompted by the witness' startling total lapse of recall, he finally testified that the price was somewhere between $100,000 and $1 million. We did not find him a credible witness and are unwilling to ground our findings on what is so obviously contrived testimony.

We also mention that, although the Government had subpoenaed Harry Kraut to appear at trial, the Government's attorney explained that he had not sought to enforce the subpoena. Inasmuch as it was represented that Harry was scheduled to appear at a trial elsewhere at the same time, the Government attorney relied upon petitioners' counsel's assurance that Aaron was every bit as knowledgeable as Harry with respect to the details of Nassau's business. At trial, petitioners' counsel did not contest the accuracy of such representation, and we simply note that petitioners must bear the consequences of their failure to adduce credible evidence of Nassau's value.

1966, untested in actual use over a period of time. Most significantly, though, was the fact that the Krauts neither obtained, nor apparently did they apply for, a patent on the new wire of such allegedly explosive sales potential, nor was it shown that production depended on a trade secret. Petitioners offered no explanation for such omission. Even assuming, arguendo, that this wire possessed the marketing potential urged by petitioners, without the protection afforded by a patent (and without any convincing evidence showing that production of the wire was based on a secret process) Nassau's competitors could have appropriated such a valuable process and a corresponding share of the market for such wire.

The decision in *Brown* rested as well upon a finding that the transaction had effected a real change of economic benefit, that the tax-exempt organization involved there was motivated by the genuine prospect of owning outright the substantial assets of a business after paying the purchase price in full. The record does not support a similar conclusion in the instant case.

Cathedral had no prospect of ending up with the substantial assets of an active business simply because Nassau owned no manufacturing assets at the time of the purported sale. Nassau's only fixed asset was an automobile; it owned no manufacturing equipment, no building, no inventory. The single piece of machinery employed in production was the extruder which it leased from Trio. By the terms of that lease, Trio had the right to determine the nature or extent of use of the machine and Nassau could make no additions or alterations to the extruder without the permission of Trio. After the initial 5-year period ending on May 31, 1971, either party could unilaterally cancel the lease. In effect, the Kraut brothers, through their wholly owned corporation, Trio, had reserved the power to terminate the lease and to repossess Nassau's sole source of income at any time after May 31, 1971. In that event, there would have been small likelihood that Nassau's two key employees, Aaron and Harry Kraut, would have remained with Nassau and applied their skills to rebuilding the business around a new extruder, even if one were available.[8] Reduced to its essentials, this arrangement in substance would have permitted petitioners, after 5 years, to deprive Cathedral of its newly acquired business, the value of which would have been obvious had the enterprise been sufficiently profitable to permit Cathedral to pay the Krauts in full.

---

[8] The extruder here under discussion had been specially tooled for the production of this wire, and the record leaves in doubt whether an extruder adapted as such might be readily available for purchase or rental.

On the other hand, although in *Brown* the Supreme Court rejected the argument that risk-shifting was an essential element of a bona fide sale, the transaction there nevertheless contemplated the payment by the exempt organization of a fixed price that was deemed to have a reasonable relationship to the subject matter of the sale. In the present case, however, the wholly unrealistic sales price coupled with the so-called sellers' remedy in the event of Cathedral's default makes it obvious that what we have here is a transaction designed, on the one hand, to insure Cathedral against any expense in the event Nassau failed to generate sufficient sales and, on the other hand, to provide the Krauts with the practical opportunity of recapturing the substance of Nassau's business in the event it proved profitable beyond the unrealistic level fixed in the contract. Our difficulty in discerning a sale in this arrangement is not that risk-shifting is absent; it is that nothing of substance has shifted other than a portion of the business' profits to Cathedral for a limited period of time. And the latter was merely the price that the Krauts paid for the opportunity of claiming capital gains treatment in respect to future speculative profits that might be realized by the enterprise. Petitioners have thus failed entirely to demonstrate that their arrangement with Cathedral contemplated the prospect of Cathedral retaining any residual interest in Nassau. It follows therefrom that the transaction lacked the essentials of an exchange upon the basis of which a sale might be founded.

In a recent decision of this Court, *Louis Berenson*, 59 T.C. 412, appeal pending (C.A. 2), the majority refused to recognize the bona fides of a purported sale of a business to a tax-exempt organization. In distinguishing the holding in *Brown*, the Court found that the agreed-upon price was "grossly excessive," bearing no relationship to the value of the assets sold or to the earnings history of the business. The Court concluded therefrom that the sale was merely a sham. In the present case the facts are even stronger than those relied upon in *Berenson*. Not only have petitioners here failed to demonstrate that the agreed-upon price was not grossly excessive, but moreover they have not shown by satisfying evidence that Cathedral entertained even a remote prospect of actually acquiring anything of value. Cathedral's residual interest in Nassau was purely nominal, and we think the facts therefore fall within the rule of *Kolkey* v. *Commissioner*, 254 F. 2d 51 (C.A. 7), affirming 27 T.C. 37. The Seventh Circuit there decided that when, in a debt-financed acquisition by an exempt organization, the sales price is so grossly inflated that the purchaser's prospect of finally owning the business outright is at best remote, the transaction does not amount to a sale. Likewise in the

instant case, we are not persuaded that petitioners formulated the terms of payment for any purpose other than to secure this right to receive 75 percent of Nassau's profits throughout the specified period. It is our opinion that the transaction never contemplated the actual transfer to Cathedral of a going business in fact. Far from comprising a sale, this was quite plainly an agreement to pay Cathedral a fee in return for lending its exemption to Nassau's earnings. This is not to say that every debt-financed acquisition of a business by a charitable organization which is payable exclusively from its future earnings is a tainted sale. But the sweep of *Commissioner* v. *Brown*, 380 U.S. 563, is not unlimited, and we do not believe that either the logic or the intent of the Court's decision there compels a finding for the petitioners before us. The Supreme Court itself in *Brown* recognized the appropriateness of a contrary result in cases like *Kolkey*, 380 U.S. at 574 fn. 7, and, in our view, there was here similarly lacking a bona fide sale.

Although our finding that petitioners have failed to prove the existence of a bona fide sale to Cathedral is conceptually sufficient to render the entire net proceeds of the transaction taxable as ordinary income to Iris and Marian Kraut, the decisions to be entered herein will necessarily be limited by the Commissioner's computation in the deficiency notices. The Commissioner there determined an amount, $168,445.60, applicable to the selling price of the stock of Nassau (on the theory that there was a bona fide sale only to the extent of that amount), and only the proceeds in excess thereof, after deducting collection expenses of $63,098.07, and interest of $56,904.16, were deemed to be ordinary income to each of the shareholders. In the proceedings in this Court, the Commissioner contended alternatively that the entire transaction was lacking in bona fides—a conclusion which we have found to be valid and which would justify charging petitioners with the entire net proceeds undiminished by any so-called true selling price of $168,445.60.[9] However, the Commissioner has not sought to amend the pleadings to ask for increased deficiencies, and

---

[9] As noted above, pp. 426–427, the Commissioner attempted to fix a selling price in terms of 10 times indicated taxable income. But, as pointed out in fn. 2, *supra*, such taxable income was $15,831.56, and 10 times that amount would be $158,315.60. Moreover, the usual method of computing value in terms of a multiple of earnings is to use an *after-tax* earnings figure, and if Nassau's $3,482.94 tax liability is subtracted from $15,831.56, there would remain net earnings of only $12,348.62. Accordingly, the 10 times earnings formula would yield a value of $123,486.20. It seems hardly likely that any greater multiple than 10 would be justified in the light of the fact that the stock was closely held, that the company's net assets were very modest in amount, that its only physical asset of any consequence was a secondhand automobile, that its successful operation obviously depended upon the continued management of the enterprise by the Krauts, that it had such a brief history, and that its sole product was untested over a sufficiently lengthy period.

in the circumstances the redetermination of deficiencies herein will be limited accordingly. Sec. 6214(a); Rule 41(a) and (b), Tax Court Rules of Practice and Procedure. Cf. *Commissioner* v. *Long's Estate*, 304 F. 2d 136, 141–142 (C.A. 9), affirming an unreported Tax Court Opinion. We wish to add that in neither *Commissioner* v. *Brown*, 380 U.S. 563, nor in *Louis Berenson*, 59 T.C. 412, did the respective Courts have before them an allocation by the Commissioner to the purchase prices therein, and our conclusion in these proceedings that the entire transaction lacked bona fides should not be interpreted as being inconsistent with the propriety of making an allocation if the facts in a particular case are thought to justify such action.

Due to concessions in another respect made prior to trial,

*Decisions will be entered under Rule 155.*