CALVIN KOVENS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Kovens v. Commissioner
Docket Nos. 5327-72, 240-76, 241-76.
United States Tax Court
T.C. Memo 1983-391; 1983 Tax Ct. Memo LEXIS 394; 46 T.C.M. (CCH) 657; T.C.M. (RIA) 83391; July 7, 1983. *394 Petitioner owned stock of a corporation that held a long-term lease to a hospital. In 1966, he sold to a tax-exempt entity (the same hospital) corporate stock sufficient in amount to transfer the hospital lease to the purchaser. The purchase agreement provided for an $800,000 downpayment, a contingent downpayment of $1,200,000, assumption of $2,173,000 in liabilities, plus the greater of $3,500,000 (payable in yearly installments of $233,333) or two-thirds of the adjusted net profits of their hospital. Held, all gain to petitioner on the stock sale is capital gain. Berenson v. Commissioner,59 T.C. 412 (1972), revd. and remanded 507 F.2d 262 (2d Cir. 1974), on remand T.C. Memo. 1978-89, revd. and remanded 612 F.2d 695 (2d Cir. 1979); and Estate of Scharf v. Commissioner,38 T.C. 15 (1962), affd. 316 F.2d 625 (7th Cir. 1963), distinguished. Petitioner incurred substantial legal expenses during 1968, 1969 and 1970. Held further, the amounts of legal expenses that are deductible are determined. Harvey M. Silets,Steven S. Brown, and Ira M. Burman, for the petitioners. W. Robert Abramitis, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: In *395 these consolidated cases, respondent determined deficiencies as follows: Taxable year
Docket No.
Petitioner
ended Dec. 31,
Deficiency
5327-72
Calvin Kovens
1968
$2,150,739.13
240-76
Calvin Kovens
1969
1,083,381.18
241-76
Calvin Kovens and
1970
227,145.86
Roz M. Kovens
After concessions, the issues for decision are (1) whether petitioners properly reported the gain from the sale of stock as long-term capital gain or whether all, or some portion, of such gain should be reported as ordinary income, and (2) whether petitioners are entitled to deduct certain legal expenses incurred during each of the years at issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and exhibits attached thereto are incorporated herein by this reference. Petitioners Calvin Kovens and his wife, Roz M. Kovens, resided in Miami Beach, Florida at the time of filing the petitions herein. Mr. Kovens filed married filing separate Federal income tax returns for the taxable years 1968 and 1969 with the Internal Revenue Service Center, Chamblee, Georgia. For the 1969 taxable year, Calvin Kovens filed an amended Federal income tax return with the *396 Internal Revenue Service Center, Chamblee, Georgia. For the taxable year 1970, petitioners Calvin Kovens and Roz M. Kovens filed a joint Federal income tax return with the Internal Revenue Service Center, Chamblee, Georgia. Roz M. Kovens is a petitioner in Docket No. 241-76 solely by reason of her having filed a joint Federal income tax return with Mr. Kovens (hereinafter petitioner) for 1970. She was not married to Mr. Kovens in either 1968 or 1969. On May 29, 1956 G. B. Certain, Sr. and Faith L. Certain, as lessors, entered into a 99-year ground lease of certain real property in Dade County, Florida, with Futurama Motel, Inc. (hereinafter Futurama Motel) as lessee. On November 29, 1957 Futurama Motel assigned to Ruedd, Inc. (hereinafter Ruedd) its lessee interest under such lease. Ruedd was a corporation whose controlling shareholder was Calvin Kovens. On August 1, 1960 G. B. Certain, Sr. and Faith L. Certain entered into two agreements with Ruedd which had the effect of splitting the parcel of real property originally leased to Futurama Motel into two parcels. One of the agreements was entitled "Lease" and covered approximately 6.7 acres of the real property that had been *397 subject to the May 29, 1956 lease. Under the terms of this agreement, Ruedd leased 6.7 acres from the Certains for the period beginning August 1, 1960 and ending on November 15, 2055, with the annual net rent to be $8,000 subject to an upward adjustment commencing with the year of the term beginning in 1970 and each 10-year anniversary thereafter. On August 5, 1960 Ruedd subleased the 6.7 acres to Good Samaritan Hospital, Inc. (hereinafter Good Samaritan), a corporation which after 1962 was owned 90 percent by Calvin Kovens, who was its president after that date, and 10 percent by Bert Sager. The annual net rent between Ruedd and Good Samaritan was $45,000 subject to an upward adjustment beginning the fifth year of the term of the lease and each 10-year period thereafter. [2]
In 1960 Good Samaritan contracted with Cal Kovens Construction Company for the construction of a hospital on the leased land. [3] Accordingly, a medical hospital was built *398 on the property during 1960 and 1961. The original building constructed for Good Samaritan was three stories high, but the roof was designed so that an additional floor could be added. On August 17, 1961 Good Samaritan entered into an agreement with North Miami General Hospital, Inc. (hereinafter North Miami General) wherein the latter leased the former's sublessee interest in the hospital land and the improvements thereon. Under the terms of this agreement, the lease commenced on September 5, 1961 and expired on November 14, 2055, with the annual net rent set at $427,500 with revaluations to occur in 1978, 1980 and every 10 years thereafter with the rent increasing to 8 percent of the appraised value of the improvements on those dates. North Miami General was organized under the laws of the State of Florida as a non-profit corporation on May 12, 1960. Petitioner, Bert Sager, and Leon Cohen were the original subscribers and were the voting members thereof. These three individuals had the right to amend the articles of incorporation and make *399 or rescind the bylaws of the corporation by a two-thirds vote. [4]
The fourth floor of the hospital was added by North Miami General after the lease was entered into with Good Samaritan. The fourth floor construction work was done by the Cal Kovens Construction Company acting as contractor on a cost-plus basis of 10 percent profit on the cost of construction. In 1965, Good Samaritan Hospital, Inc., along with Miracle Plaza, Inc., was merged into Keith Investments, Inc. (hereinafter Keith Investments), and after the merger, petitioner owned 114 of the 120 outstanding shares of Keith Investments while Bert Sager owned the remaining 6 shares. [5]
As of 1966 Howard M. Lawn was in the business of acquiring and managing businesses for non-profit entities, principally *400 for the Roman Catholic Diocese of Austin, Texas. He first became aware of the existence and circumstances of North Miami General in March 1966 through one of petitioner's bankers. Mr. Lawn met with petitioner on or about April 11, 1966. At that time, he was not representing a specific client, but was acting on behalf of any one of at least three prospective clients in investigating the possible acquisition of North Miami General. He was not acting on petitioner's behalf. At the outset of negotiations, Mr. Lawn attempted to acquaint petitioner, Mr. Sager, and their representatives with his "Clay Brown Formula. " This formula, structured to fit certain guidelines set out in the Supreme Court decision, Commissioner v. Brown,380 U.S. 563 (1965), dealt with the purchase of a business with a portion of the purchase price to be paid out of the future earnings of that business. Mr. Lawn represented that, under his formula, such sales proceeds would be entitled to capital gains treatment. Petitioner, on the other hand, wished to be paid a flat price for the sale of his Keith Investment stock, which, by virtue of the long-term lease, would effectively transfer ownership of the hospital *401 to the purchaser of the stock. Petitioner also desired to retain some measure of control over the hospital subsequent to the sale. At the time that Mr. Lawn initiated the negotiations with petitioner and Mr. Sager for the purchase of sufficient stock to cover the hospital assets, he represented in various capacities the New York Academy of Sciences, LaSallette Fathers, Fordham University, Sloane-Kettering Foundation, and the Strang Clinic. During the negotiations, Mr. Lawn's advisers or "team" included attorneys from the law firm of Burke & Burke and Herbert Winick, a CPA with the accounting firm of Winick, Barnett and Schiffer. In early May 1966 Mr. Lawn and his advisers met with petitioner, Mr. Sager and their advisers, who included David J. Whelan and San Ready. During the meeting, Mr. Lawn presented his purchase concept. On May 13, 1966 the two groups met in New York to discuss the proposed purchase of the hospital. At the meeting, Mr. Lawn stated that a fair price for the hospital was somewhere below $8,000,000, or a minimum of two-thirds of earnings for the next 15 years, whichever proved to be higher. During the period from May 13, 1966 to the end of June 1966, Mr. Lawn *402 and his advisers considered the price of the Keith Investments stock and compared it with the hospital's discounted commitment to Keith Investments under the lease. In projecting the hospital's future lease payments to Keith Investments, Mr. Lawn and his advisers used a discount rate of 5 percent. [6] Mr. Lawn and his advisers projected that the present value of the payments under the hospital's lease to Keith Investments would be approximately $18,000,000. They concluded that, under a reasonable earning level, the total amount paid under a purchase agreement should be approximately $11,000,000. They decided to set a minimum price of $5,500,000 with a contingency of two-thirds of earnings for 15 years. Petitioner, on the other hand, wanted a 75 percent of earnings contingency and a $10,000,000 minimum, and he wanted a degree of control. Negotiations were often heated. In June, petitioner requested Mr. Lawn to identify a buyer, leading Mr. Lawn to conclude that *403 petitioner had accepted the terms of the transaction. Mr. Lawn, mostly through Father John Joseph Lynch, presented the purchase proposition to representatives of the Society of Jesus. After several meetings between Mr. Lawn and representatives of the Society of Jesus, intense negotiations took place between representatives of the Society and petitioner's representatives and a purchase agreement was drafted. However, on September 9, 1966, Father Lynch called Mr. Lawn and informed him that a determination had been made that the Jesuits could not own property outside of the metropolitan area of New York under canon law and were therefore unable to purchase the hospital. Mr. Lawn then approached representatives of the LaSallette Fathers and kindled their interest in the possible acquisition of the hospital. Thereafter, a number of representatives of the LaSallettes visited Miami for 2 days, met with petitioner and Mr. Sager, and toured the hospital. The LaSallettes eventually backed out of the deal, however, because petitioner demanded too much post-sale control over the hospital and too high a downpayment. Mr. Lawn then turned his attention to the New York Academy of Sciences, with *404 which he had had previous dealings. He first contacted Dr. Norman Henry Moss, president of the Academy, and Mrs. Eunice Thomas Miner, executive director of the Academy, and both became interested. After these two individuals discussed the proposal with the financial adviser of the Academy, it was decided that the Academy would not, as an entity, acquire the hospital, but that Father Lynch, who was chairman of the board of the Academy, Dr. Moss and Mrs. Miner in their individual capacities would undertake the responsibilities and authority of taking over the hospital, under the aegis, blessing and cooperative effort of the Academy. On November 4 through November 7, 1966, these three individuals, along with Mr. Lawn, thoroughly inspected the premises of North Miami General and involved themselves in discussions with Mr. Sager, petitioner, Mr. Whelan and Mr. Ready. [7] *405 A purchase agreement was reached sometime in November of 1966. Thereafter, all members of the board of trustees, with the exception of petitioner, Mr. Sager and Lawrence Brett, submitted their resignations to petitioner, then president of North Miami General. On November 25, 1966 the three remaining trustees of the hospital elected Father Lynch, Dr. Moss and Mrs. Miner to succeed them and they resigned as officers and trustees of the hospital subject to the acceptance of the new trustees. It was contemplated that the three new appointees would accept the purchase transaction as negotiated. The new trustees held a formal meeting of the board of trustees on November 30, 1966 to elect officers and authorize them to consummate the purchase. The officers signed the Purchase Agreement on that date. On November 30, 1966 North Miami General entered into a contract with petitioner and Mr. Sager to purchase 80 percent of the issued and outstanding capital stock of Keith Investments. It was contemplated by the parties that North Miami General would acquire and take title to the hospital assets and liabilities and that *406 petitioner and Mr. Sager would retain the other assets and liabilities. An agreement was drafted to effectuate this intent. The agreement between North Miami General and petitioner and Mr. Sager provided that the sellers were to receive a downpayment of $800,000, plus a contingent downpayment of $1,200,000 (payable within 3 years if financing could be obtained and otherwise payable at the end of 15 years), plus the greater of $3,500,000 (payable in yearly installments of $233,333) or two-thirds of the "adjusted net profits" (as that term was defined in the agreement) for 15 years. [8] All payments received by petitioner and Mr. Sager pursuant to the Purchase Agreement were to be divided with 95 percent to petitioner and 5 percent to Mr. Sager. A note dated December 1, 1966 by North Miami General to petitioner and Mr. Sager was executed pursuant to the November 30, 1966 Purchase Agreement. [9] *407 On December 23, 1966 Keith Investments adopted a plan of complete liquidation. The $800,000 downpayment was paid $175,000 in 1966 and $625,000 in 1967. The $1,200,000 "contingent downpayment" was fully paid in 1967. Petitioner elected to report his receipts from the purchase agreement on the installment method. He reported in income as long-term capital gain the following sums received pursuant to the Purchase Agreement: Year
Amount Reported
1966
$778,472.22
1967
1,423,422.00
1968
855,741.89
1969
996,277.47
1970
173,112.36 Father Lynch, Dr. Moss and Mrs. Miner wished to insure a smooth transition and good rapport with the doctors of the acquired hospital, and consequently, acting on behalf of the hospital, they entered into a contract on December 31, 1966 with Hospital Management Corporation, a corporation owned 90 percent by petitioner and 10 percent by Mr. Sager, whereby Hospital Management Corporation agreed to act as a consultant to the board. At all times, Hospital Management Corporation was subject to the control and supervision of the board of trustees. Although the new trustees expected to benefit from petitioner's familiarity *408 with the doctors at the hospital, it turned out that petitioner had alienated a number of doctors. In July 1970 a dispute arose between Hospital Management Corporation and the hospital which culminated in a lawsuit and the eventual termination of the contract between the two entities. As of the year 1966, Mr. David Whelan, a practicing certified public accountant in the State of Florida, was employed by petitioner as his financial adviser and as such advised him in financial dealings, prepared budgets and cash forecasts and maintained his books and records, both personal and corporate. Mr. Whelan participated extensively on behalf of petitioner and Mr. Sager in the negotiations for the sale of the Keith Investments stock. Petitioner was also advised in the negotiations by independent CPAs Sam Ready and John Ring, both partners in the firm of Ring, Mahony and Arner. Mr. Ready prepared a valuation of the leasehold which reflected a net figure of approximately $7,000,000. In his calculations, he consulted with others and arrived at a discount factors of 5 percent. For purposes of calculations and evaluating the leasehold, Mr. Whelan independently arrived at a 5 percent figure. His *409 rate was based at least partially upon the prescribed rate under section 483, I.R.C. 1954, at that time. For the years 1968, 1969 and 1970, the following amounts were paid by petitioner and claimed by him as deductions for legal expenditures: United States v. Kovens
1968
1969
1970
Cottone & Fenelli
$5,540.00
U.S. Law Printing Co.
14,301.75
$4,033.85
Harris, Burman & Silets
30,912.73
$41,890.17
9,442.28
Abraham Adler
10,000.00
Maher & Murray
33,215.44
Morris A. Shenker
5,000.00
Maurice J. Walsh
10,000.00
Fowler, White
10,000.00
Shimmel & Hill
5,000.00
Herbert B. Burris
5,000.00
Daniel B. Maher
9,554.76
Forer & Rein
3,000.00
Ragano & LaPorte
475.00
Smathers, Merrigan,
O'Keefe
25,000.00
Sibley, Giblin,
Levenson & Ward
10,000.00
McDonald, Carono &
5,020.00
Wilson
5,020.00 The trial in a case styled United States v. Kovens concluded in the United States District Court for the Northern District of Illinois in 1964 and appeals and post trial proceedings occurred in 1968, 1969 and 1970. The indictment in the case charged the petitioner and other defendants with conspiring to defraud and defrauding the Central States, Southeast and Southwest Areas Pension Fund by submitting false and misleading statements of material facts and by *410 concealing material facts in order to obtain loans from the pension fund. Petitioner's participation in the events involved in the case of United States v. Kovens related to loans from the pension fund to entities which the Cal Kovens Construction Company had contracted with for construction jobs. Petitioner was found guilty as charged in counts 1, 6, 7, 9, 21 and 28 and was found not guilty on all remaining counts of the indictment. The amounts paid to U.S. Law Printing Co., Harris, Burman & Silets, Abraham Adler and Herbert Burris were incurred in connection with the appeal from the conviction of petitioner in United States v. Kovens. The item designated as paid to Sibley, Giblin, Levenson & Ward was paid for general legal advice in connection with investments, banking relations, the securing of credit and miscellaneous tax advice. [10] The amount of $5,020 was paid to McDonald, Carono & Wilson for legal services performed in connection with investments of petitioner in Lake Tahoe. The $25,000 amount paid to Smathers, Merrigan & O'Keefe in 1970 was paid by petitioner to secure parole or pardon and a more acceptable place of incarceration. All other expenses were incurred in connection *411 with the case of United States v. Kovens.
On petitioner's income tax returns for 1968, 1969 and 1970, he reported capital gains from the sale of the stock of Keith Investments in the amounts of $855,741.89, $996,277.47 and $173,112.36, respectively. In his notices of deficiency for those years, respondent determined that the petitioner should have reported the gain from the sale as ordinary income in the amounts of $855,741.89, $955,562.85 and $132,361.74, respectively. On petitioner's returns for 1968, 1969 and 1970, the amounts of $122,650.27, $125.201 and $57,362.91, respectively, were claimed as deductions for legal fees. In his notices of deficiency, respondent determined that no amount of legal fees in 1968 was deductible and only the amounts of $6,589.70 and $3,428 were deductible in 1969 and 1970, respectively. OPINION The primary issue in this case is whether the gain to petitioner on the sale of the Keith Investments stock should be characterized as ordinary income or long-term capital *412 gain. Respondent contends that petitioner has failed to carry his burden of proving that any of the gain from the stock sale was attributable to the appreciation in value of such stock. Respondent argues that the gain attributable to petitioner's use of North Miami General's tax-exempt status must be characterized as ordinary income pursuant to Berenson v. Commissioner,59 T.C. 412 (1972), affd. in part and revd. in part 507 F.2d 262 (2d Cir. 1974), on remand T.C. Memo. 1978-89, revd. and remanded 612 F.2d 695 (2d Cir. 1979). While respondent's argument is not clearly formulated, it appears that his position is that petitioner received an excessive purchase price for his stock as a result of his alleged manipulative use of the hospital's tax-exempt status for his own benefit and that such excess is taxable as ordinary income. Respondent relies heavily on the burden of proof is asserting that all gain to petitioner must be characterized as ordinary income. In Berenson v. Commissioner,supra, the taxpayers purportedly sold the stock of two corporations, one a manufacturer of women's sportswear and the other a selling organization, to a tax-exempt religious organization. The purchase *413 price was based upon a projection of estimated earnings before tax, with 80 percent of such earnings allocated to the taxpayers and 20 percent allocated to a partnership in which the tax-exempt entity had a 95.5-percent profit interest. The overall price came to $6 million payable with interest at the minimum statutory rate over a 13-year period for a total of $7,840,000. During the period of the payout, the agreement provided that the taxpayers would continue to operate the businesses as salaried employees of the partnership. In the original Tax Court proceeding, we found that the "stated price of $6 million was more than double the price that would be paid for the stock" by a taxable entity. Berenson v. Commissioner,59 T.C. at 416. Observing that the purchase was "grossly disproportionate to [the] present value of the business," we detected "a strong inference that the schedule of payments was intended, not as the purchase price, but as a means of returning the earnings to the former owners of the business at a tax saving." Berenson v. Commissioner,59 T.C. at 422. Sizing up the situation, we stated that [t]he failure of the price to bear any relationship to the value of assets *414 sold, the dependency of earnings on the managerial skills of the sellers, the postponement of any realization by the temple of the benefits of the sale during a 13-year payout period, coupled with the fact that when that period expired the temple would receive only one-half of what remained, lead inescapably to the conclusion that the transaction was in substance an agreement by the temple to lend its tax exemption to the petitioners for a period of years in exchange for a share in the tax savings resulting therefrom. * * * [Berenson v. Commissioner,59 T.C. at 423.] Accordingly, we held that the transaction was not in substance a sale or exchange of a capital asset within the meaning of section 1222(3), I.R.C. 1954, and therefore that all gain to the taxpayers was ordinary income. Berenson v. Commissioner,59 T.C. at 424. On appeal, the Second Circuit reversed and remanded on the ground that the transaction constituted a "sale" within the capital gains provisions to the extent that the proceeds received by the taxpayers did not exceed the fair market value of the stock had it been purchased by a nonexempt entity. Berenson v. Commissioner, 507 F.2d at 269. [11] *415 The taxpayer in Berenson argued that all gain derived from the transaction should be treated as capital gain pursuant to Commissioner v. Brown,380 U.S. 563 (1965). In Brown, the taxpayers sold the stock of a lumber company to an exempt organization for $1.3 million, payable $5,000 down and the balance without interest out of earnings over a period of 10 years. The assets of the business were leased for a 5-year period to a new corporation which was formed and wholly owned by the attorneys for the taxpayers. The new corporation was obligated to pay 80 percent of its operating profit to the exempt organization, which in turn was obligated to pay 90 percent of such amounts to the taxpayers *416 in satisfaction of the purchase obligation. The new corporation continued operations on the same premises and with practically the same personnel as the old corporation. The Commissioner argued that the transaction did not constitute a sale since the tax-exempt entity invested nothing, assumed no independent liability for the purchase price and promised only to pay over a percentage of the earnings of the company, thereby placing the entire risk of the transaction on the sellers. The Supreme Court rejected this argument, declaring that such risk-shifting to the buyer was "not an essential ingredient of a sale for tax purposes." Commissioner v. Brown,supra at 570, 574. [12] Relying upon the Tax Court's finding that the price paid was within reasonable limits, i.e., that it was not excessive, and upon the fact that there was a real change in economic benefit, the Court held that the transaction constituted a sale and that all gain was to be characterized as capital gain. Commissioner v. Brown,supra at 573, 579. The Tax Court in Berenson found Brown to be distinguishable based in part on the fact that the stated price in Berenson was grossly excessive. This, among other factors, contributed *417 to the conclusion that the transaction was not "in substance" a sale. [13] *418 The facts in the instant case are easily distinguishable from those in Berenson v. Commissioner,supra, Kraut v. Commissioner,62 T.C. 420 (1974), affd. 527 F.2d 1014 (2d Cir. 1976), and even Commissioner v. Brown,supra, simply because petitioner gave up all control over the "business" that was sold to the tax-exempt organization. This is clearly not a situation where petitioner has channeled income through an exempt organization to avoid tax at the corporate level and to convert ordinary income to capital gain through an agreement by the exempt organization to lend petitioner its tax exemption in exchange for a share of the tax savings. The transaction in substance shifted complete control and ownership of the hospital to North Miami General. Unlike Berenson,Brown, and Kraut, there was no leaseback of the business to the sellers or their representatives, for the acquired "business" was not unrelated to the business of North Miami General. Thus, as in Commissioner v. Brown,supra, there can be no argument that the transaction was a "sham." See Commissioner v. Brown,380 U.S. 563, 568 (1965). The *419 risk-shifting in this case also provides a distinction from Berenson. This is not a situation where the tax-exempt entity bore no risk and invested none of its own resources, independent of its obligation to pay a percentage of future earnings, in the property acquired. Here, North Miami General made substantial downpayments of $800,000 and $1,200,000 during the first 2 years. Additionally, North Miami General assumed $2,173,000 in liabilities as part of the purchase. Finally, it was obligated to make substantial installment payments even if the hospital's earnings fell below the amount owed. Certainly, it cannot be contended that North Miami General did nothing more than lend petitioner its tax-exempt status.
The fact that there is an indefinite and productivity-contingent purchase price does not disqualify a bona fide transfer from constituting a sale. [14] Here there can be no doubt that petitioner sold his stock in Keith Investments to North Miami General. Respondent contends, however, that to the extent that the purchase price exceeds the amount a taxable entity would pay to acquire the hospital, *420 it does not constitute the proceeds of sale but rather the fruits of petitioner's improper harnessing of North Miami General's tax exemption. Respondent then takes the unusually extreme position that all gain to petitioner from the transaction is derived from such source and is therefore taxable as ordinary income. This position defies reality. We find that the sales agreement resulted from good faith bargaining at arm's length between petitioner and Mr. Lawn, who eventually located a buyer of the hospital. Moreover, we are persuaded by petitioner's expert that the overall purchase price embodied in the sales agreement is within a "reasonable range" and that North Miami General's primary motivation in entering the transaction was simply to acquire the hospital assets. See Commissioner v. Brown,supra at 569. Of foremost importance is the fact that the sales agreement was the result of earnest, bona fide, arm's-length negotiations. Initially, petitioner insisted upon a lump-sum payment for the stock and upon the retention of a measure of control over the hospital. During the course of the negotiations, he was persuaded to accept deferred payment of a large portion of the purchase *421 price and to relinquish control over the hospital. The evidence indicates that the parties haggled over the purchase price as well as the structure of the transaction. The fact that the Society of Jesus was fully prepared to acquire the hospital and that a purchase agreement was drafted after intense negotiations demonstrates that the acquisition transaction was attractive to more than one "willing buyer." [15] On the whole, we believe that the purchase agreement was the product of bona fide, arm's-length bargaining. [16] We see no reason to engage in a prolonged review of the parties' experts. Petitioner's expert was well prepared and ably defended his valuations of the sales agreement ($9,617,000) *422 and of the lease agreement ($10,408,000). On the other hand, respondent's expert was less than convincing. His valuations resulted from the application of different discount rates to the computations of petitioner's expert and of Mr. Ready. Thus, though he readily adopted the methodology of petitioner's expert, he supplanted the discount rates to create a disparity in value between the lease and the sales agreement. Respondent's expert experienced repeated difficulty explaining many of the computations made in his report. On cross-examination, he was disconcertingly evasive and his valuation comparison with "similar" properties was effectively undermined. In sum, without accepting the precise conclusions reached by petitioner's expert, we are convinced that the price paid by North Miami General for the stock was within a reasonable range. [17] *423 We have demonstrated that the facts of this case do not fall within the more sensitive sale and leaseback scenario that existed in Berenson v. Commissioner,59 T.C. 412 (1972), affd. in part and revd. in part 507 F.2d 262 (2d Cir. 1974), on remand T.C. Memo. 1978-89, revd. and remanded 612 F.2d 695 (2d Cir. 1979); Kraut v. Commissioner,supra, and even in Commissioner v. Brown,380 U.S. 563 (1965). Moreover, we have concluded that the purchase price paid by North Miami General was not "unrealistic" or "unreasonably excessive." Respondent's final contention is that a portion of the amounts received by petitioner is attributable to his sale of the control of North Miami General by resigning as trustee to make way for the new trustees. At trial, respondent argued that petitioner retained control of the hospital by means of the management contract between North Miami General and Hospital management Corporation. Respondent made this assertion in order to fit the facts of *424 the instant case more snugly into the factual pattern present in the "abuse" cases like Berenson and Kraut. Faced with irrefutable evidence that petitioner did not in fact retain control of the hospital, respondent shifts his position by arguing that a portion of the proceeds of the sale was paid to petitioner for the relinquishment of control. Again, respondent relies heavily on the fact that petitioner bears the burden of proof, a burden that is made difficult by respondent's shift in position. In Estate of Scharf v. Commissioner,38 T.C. 15 (1962), affd. 316 F.2d 625 (7th Cir. 1963), we held that amounts received for the sale of membership certificates in an Illinois nonprofit corporation were taxable as ordinary income to the sellers. We do not believe this case to be controlling. First, the amounts received by petitioner were paid by North Miami General, not by the new trustees. Since there is no evidence that the new trustees caused the hospital to pay monies on their behalf, we can find no evidence that separate amounts were paid for the "acquisition" of the vacated trustee positions. Secondly, the acquisition of the hospital by North Miami General would have been incomplete *425 without the transfer of control. Such transfer was integral to the transfer of the hospital itself, and, in these circumstances, should not be isolated and given ordinary income treatment any more than the transfer of control that accompanies the sale of the controlling stock of a taxable corporation should be severed from the entire transaction and treated differently. Finally, we have found that North Miami General paid a price in the reasonable range for the 89-year lease. Accordingly, petitioner has met his burden that all gain on the transaction was attributable to appreciation of the Keith Investments stock and is taxable as capital gain. The other issue to be decided is whether certain legal fees incurred by petitioner during the years at issue are deductible. We first address the legal expenses incurred in connection with petitioner's appeal from his conviction in United States v. Kovens.
In determining whether legal expenses are deductible, we must look to the "origin and character of the claim with respect to which the expense was incurred." United States v. Gilmore,372 U.S. 39, 49 (1963). If the legal expenses relate to a claim that arose out of petitioner's business *426 as the president of Cal Kovens Construction Company, then they are deductible pursuant to section 162. Here, the criminal charges and conviction clearly arose from crimes committed by petitioner as a result of his activities as president of his construction business. The fact that such expenses related to the appeal of a criminal conviction does not preclude their deductibility once the "origin and character" test is met. Commissioner v. Tellier,383 U.S. 687 (1966). We hold that all legal expenses incurred in connection with United States v. Kovens are deductible.[18] The amount paid to Smathers, Merrigan & O'Keefe in 1970 is fully deductible. This expense originated from petitioner's business and in connection with the criminal conviction. In 1969 petitioner paid $10,000 to Sibley, Giblin, Levenson & Ward for general legal advice in connection with investments, banking relations, the securing of credit and miscellaneous tax advice. Fees paid for general advice with respect to the management of investments are deductible. Section 1.212-1(g), Income Tax Regs.; Honodel v. Commissioner,76 T.C. 351, 367 (1981); Bagley v. Commissioner,8 T.C. 130, 135 (1947). *427 Fees paid for tax advice are deductible pursuant to section 212(3). However, fees for advice rendered in connection with the acquisition of specific property constitute nondeductible capital expenditures that must be added to the basis of the acquired property. Honodel v. Commissioner,supra at 367. Petitioner has not proven the extent to which the amounts paid for investment advice and for "advice concerning banking relations and securing of credit" were incurred for purposes other than the acquisition of property. Moreover, petitioner has not shown what portion of the $10,000 expense is allocable to tax advice. However, based on our belief that a substantial portion, but not all, of the fee paid to Sibley, Giblin, Levenson & Ward is deductible, we apply the rule of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930), and hold that one-half, or $5,000, of the amount so paid is deductible pursuant to section 212. With respect to the $5,020 paid by petitioner in connection with investments in Lake Tahoe, we find that petitioner has failed to prove that such expenses were not capital expenditures incurred for the acquisition of property, and, therefore, we hold that petitioner is not *428 entitled to deduct this amount. McDonald v. Commissioner,52 T.C. 82, 89 (1969). To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Calvin Kovens, docket No. 240-76; and Calvin Kovens and Roz M. Kovens, docket No. 241-76.↩
2. Their sublease was for the period beginning August 5, 1960 and expiring on November 14, 2055. There is no explanation why the value of the lease appreciated from $8,000 annual rent to $45,000 annual rent between August 1 and August 5, 1960.↩
3. Cal Kovens Construction Company is now and always has been a corporation wholly owned by Calvin Kovens, who has always been its president.↩
4. Petitioner was the initial president and chairman of the board of trustees, Sager was the secretary, and Leon Cohen was the initial treasurer. Other members of the board of trustees were Edmund G. Vischi, Thomas Sasso, Joseph T. Jana, Jr., and Lester A. Russin.↩
5. Miracle Plaza, Inc. was a Florida corporation which owned and operated a shopping center in Vero Beach, Florida. Petitioner was the president of that corporation.↩
6. This figure was arrived at by Mr. Lawn and his advisers after consulting with a vice president of Chase Manhattan Bank, a representative of Citi-Bank in New York, various persons at Burke & Burke, Herb Winick and others.↩
7. Mr. Lawn never was promised, nor did he receive, any finder's fee or fee of any kind from petitioner or Mr. Sager for his involvement in the sale of the Keith Investments stock, nor was he ever an employee or agent of petitioner's. His relationship with petitioner and Mr. Sager during the negotiations was adversarial in nature and their relationship deteriorated subsequent to the sale.
8. In addition, North Miami General assumed indebtedness of Keith Investments in the amount of $2,173,000. ↩
9. The obligation of the hospital under the Purchase Agreement was general with recourse and therefore the hospital's risk was not restricted to future earnings. The assets obtained by North Miami General were pledged as collateral for the purchase price.
10. Petitioner apparently concedes that legal expense deductions claimed on his return for 1968 in the amount of $55.35 and on his return for 1969 in the amount of $331.48 are not deductible.↩
11. The subsequent history of this case does not clarify matters. On remand, the Tax Court held that the present value of the purchase price was less than the fair market value of the two corporations, and therefore that all gain was capital gain. Berenson v. Commissioner,T.C. Memo. 1978-89. On appeal, the Second Circuit again reversed and remanded on the ground that the Tax Court had failed to carry out its instructions on the first remand. Berenson v. Commissioner,612 F.2d 695↩ (2d Cir. 1979). The case has since been settled.
12. We note that the Tax Reform Act of 1969 provided, in the so-called "Clay Brown provision," that an exempt organization's income from "debt-financed property," as defined in sec. 514(b), which is not used for its exempt function, is to be subject to tax in the proportion in which the property is financed by debt. See secs. 512 and 514. ↩
13. See also Kraut v. Commissioner,62 T.C. 420 (1974), affd. 527 F.2d 1014 (2d Cir. 1976), where the taxpayers sold a wire manufacturing corporation to a tax-exempt religious organization for a flexible sales price ranging from a minimum of $500,000 to a maximum of $3.5 million payable primarily out of 75 percent of the business net income for the ensuing 10 years. As employees, the taxpayers remained in control of the operation of the business. In case of default, the taxpayers' sole recourse was the enforcement of a lien upon the business assets. Based on these facts, we held that an actual transfer of a going business to the tax-exempt entity was never contemplated. The transaction was merely an agreement to pay the exempt organization a fee for the use of an exemption and therefore was not a bona fide sale. Kraut v. Commissioner,62 T.C. at 434↩.
14. See the analysis and the cases cited in Allen v. Commissioner,T.C. Memo. 1975-39↩.
15. As stated in the facts, the Society of Jesus was forced to withdraw from the transaction due to the fact that it was forbidden to own property outside of the metropolitan area of New York under canon law. This limitation was not discovered until late in the negotiations. ↩
16. The fact that petitioner initially insisted upon a lump-sum payment for the stock indicates that, at the outset of the negotiations, he had no intention of participating in or bailing out the future earnings of the hospital.↩
17. We note that in Berenson v. Commissioner,59 T.C. 412 (1972), affd. in part and revd. in part 507 F.2d 262 (2d Cir. 1974), on remand T.C. Memo. 1978-89, revd. and remanded 612 F.2d 695 (2d Cir. 1979), the case which respondent argues is controlling, it was declared that "we must inevitably come to the conclusion that the stated price of the transaction between the petitioners and the temple was grossly excessive. Petitioners' counsel freely admitted as much." Berenson v. Commissioner,59 T.C. at 422↩. The facts in the instant case are quite different.
18. See Murphy v. Commissioner,T.C. Memo. 1980-25↩.